BRADLEY H. COHEN
bradley.cohen@cfpb.gov
Consumer Financial Protection Bureau
DC Bar No. #495145
Pro Hac Vice Admission Pending
Tel.: 202-435-9280
TRISHANDA L. TREADWELL
trishanda.treadwell@cfpb.gov
Consumer Financial Protection Bureau
GA Bar No. #356896
Pro Hac Vice Admission Pending
Tel.: 202-808-6277
1700 G Street, N.W.
Washington, D.C. 20552
Fax: 202-435-5471
JOSEPH LAKE (CA Bar No. 246679)
joseph.lake@cfpb.gov
Local Counsel for Consumer Financial Protection Bureau
Tel: 202-897-8360
301 Howard Street, Suite 1200
San Francisco, CA 94105
Fax: 415-844-9788

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, Plaintiff, <br><br> v. <br><br> SOLO FUNDS, INC., Defendant. | Case No. 2:24-cv-4108 <br><br> **COMPLAINT FOR VIOLATIONS OF THE CONSUMER FINANCIAL PROTECTION ACT OF 2010 AND THE FAIR CREDIT REPORTING ACT** <br><br> Date: <br> Time: <br> Room: <br> Judge: |

1

**INTRODUCTION**

1.     The Consumer Financial Protection Bureau ("Bureau") brings this action under §§ 1031, 1036(a), 1054, and 1055 of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531, 5536(a), 5564 and 5565, and under Section 607(b) of the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681e(b). This court has subject-matter jurisdiction over this action because it is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1); presents a federal question, 12 U.S.C. § 1331; and is brought by an agency of the United States, 28 U.S.C. § 1345.

2.     SoLo Funds, Inc. ("SoLo" or "Defendant") is a fintech company that operates a nationwide website and mobile-application based peer-to-peer marketplace ("SoLo Platform") through which consumers can obtain small-dollar, short-term loans.

3.     SoLo markets its online lending platform to prospective borrowers as a consumer-friendly alternative to high-cost, short-term loans. But SoLo misleads borrowers with advertising and disclosures that falsely tout no-interest loans when, in fact, consumers are routinely subject to fees that result in an exorbitant total cost of credit. In addition, Defendant illegally services and collects on loans that are void or uncollectible in numerous states. Defendant also gathers and shares borrowers' credit information with prospective lenders but fails to take steps to ensure the maximum possible accuracy of that information. Lastly, when loans are overdue, SoLo has repeatedly attempted to coerce payment by falsely threatening to report borrowers to the credit bureaus even though it did not report borrowers to the credit bureaus.

4.     Defendant invites consumers to apply for loans through its website

and mobile lending application, falsely stating in advertisements that consumers could obtain financing on terms that included "no interest," "0% APR," or "0% interest." At the same time, SoLo invites consumers to serve as individual lenders to fund loan requests and thereby make a profit, based on the purported "tips" that the borrowers would pay ("Lender tip fee"). During the loan application process, borrowers are prompted to select a Lender tip fee and encouraged to pay larger tips to get funded.

5.     The Lender tip fee is only one of the fees borrowers are expected to pay to obtain a loan. The loan application process includes an additional step in which the borrower is prompted to select one of three default "donation" fees that goes directly to SoLo ("SoLo donation fee"). SoLo does not provide consumers with a "$0" SoLo donation fee option during the loan application process or even a way to click through to the next page without selecting a SoLo donation fee. Furthermore, Solo obscures the method by which consumers can opt for no donation fee, hiding it in another section of its mobile application and failing to provide readily available information to consumers about how to disable the donation fee.

6.     Virtually all consumers who receive loans incur a Lender tip fee, a Solo donation fee, or both.

7.     Defendant provided borrowers with loan documents that purported to disclose the amounts owed and costs of the loans but failed to disclose fees that SoLo would seek to collect. For example, some of these documents stated that only the principal amount was due, and others failed to include the Lender tip fee and SoLo donation fee in the calculation of the finance charge and annual percentage rate for the loan.

8.     SoLo also serviced and collected (and attempted to collect) on loans

that were void and uncollectible under the laws of a number of states because the loans were not made by a licensed person or entity and/or the loans were in excess of state usury limitations. In such states, all the loans brokered were void and uncollectible. SoLo deceptively, unfairly, and abusively represented that these loan amounts were due and attempted to collect and collected on those loans.

9.     To aid lenders' ability to vet consumers' loan applications, SoLo gathers credit information about prospective borrowers' bank accounts, debit cards, and prior SoLo loans and combines that information received from third parties into a credit score—the "SoLo Score." SoLo then provides this SoLo Score to prospective lenders. However, SoLo failed to maintain reasonable procedures to ensure the maximum possible accuracy of the SoLo Score it shared with prospective lenders.

10.    Finally, SoLo repeatedly attempted to coerce payment on loans obtained through the SoLo Platform by misrepresenting that if the consumer failed to repay the loan on the due date, it would be reported to the credit bureaus and negatively impact the consumer's credit score, even though SoLo never reported any of its loans to the credit bureaus and was not set up to do so.

## VENUE

11.    Venue is proper in this district because Defendant is located, resides, or does business in this district. 12 U.S.C. § 5564(f).

## PARTIES

12.    The Bureau is an independent agency of the United States created by the CFPA and charged with enforcing "Federal consumer financial laws." 12 U.S.C. § 5491(a).

Complaint

4

13.     The Bureau is authorized to initiate civil actions in federal district court proceedings in its own name and through its own attorneys to address violations of "Federal consumer financial law," including the CFPA and FCRA, and to secure appropriate relief for violations of those provisions. 12 U.S.C. §§ 5564(a)-(b), 5565.

14.     Defendant is a Delaware corporation with its principal place of business in Los Angeles, California.

15.     Defendant is a "covered person" pursuant to 12 U.S.C. § 5481(6)(A) because it offers and provides consumer financial products or services, as defined under 12 U.S.C. § 5481, which include: brokering of extensions of credit to consumers and servicing of loans; collecting, analyzing, maintaining, or providing consumer report information or other account information, including information relating to the credit history of consumers, used or expected to be used in connection with any decision regarding the offering or provision of a consumer financial product or service; and collecting debt related to any consumer financial product or service. 12 U.S.C. § 5481(15)(A)(i), (ix), and (x).

16.     Defendant is also a "service provider" pursuant to 12 U.S.C. § 5481(26)(A) because it provides a material service to covered persons in connection with extensions of credit. This includes, but is not limited to, participating in designing, operating, or maintaining the extensions of credit. *Id.* § 5481(26)(A)(i).

17.     Defendant is also a "consumer reporting agency" subject to the Bureau's jurisdiction under FCRA because it, for monetary fees or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other

information on consumers for the purpose of furnishing consumer reports—in the form of SoLo Scores and number of loans repaid—to third parties. 15 U.S.C. § 1681a(f). Defendant assembles or evaluates the consumer information for monetary fees in the form of SoLo donation fees, or alternatively, assembles or evaluates the consumer information on a "cooperative nonprofit basis."

## FACTUAL ALLEGATIONS

### SoLo's Platform

18.    Since 2018, SoLo has operated its rapidly growing SoLo Platform through which consumers can obtain small-dollar, short-term loans.

19.    SoLo publishes terms for participation in its Platform ("Terms"), which state that a consumer "may submit an application and obtain a personal loan."

20.    The maximum SoLo loan amount is $575, and the minimum is $20. Prospective borrowers can generally set a single repayment date that is less than a month but as short as a few days after the loan is funded. After 35 days, SoLo assesses late fees if the loan has not been repaid.

21.    Defendant's click-through loan application process requires the prospective borrower to set the Lender tip fee—a fee payable to the person who funds the loan request. Although SoLo advertises that a borrower can request a loan with a $0 tip, such loan requests are unlikely to be funded on the SoLo Platform. As of December 31, 2022, only 0.5% of loans funded on the SoLo Platform did not include a Lender tip.

22.    The application process also includes a screen for prospective borrowers to select a SoLo donation fee payable to SoLo. SoLo instructs the applicant to select one of three default percentages of the loan amount as the

SoLo donation fee. A selection is required to submit the loan application. SoLo did not offer a 0% option for the SoLo donation fee on this screen.

23.   Defendant requires prospective borrowers to provide bank account information during the loan application process. For consumers whose loans are funded, SoLo uses the provided bank information to schedule an automatic payment from the borrower's deposit account on the designated due date.

24.   A key feature of the SoLo Platform is that individual consumers are invited to review borrowers' loan requests, evaluate the applications, and decide whether to fund the loan requests; those individual consumers who fund loan requests become lenders.

25.   To facilitate lending, SoLo provides prospective lenders with consumer credit information. Namely, SoLo collects information from other companies, including Apple, Google, and Plaid, concerning an applicant's cell phone, debit card, and deposit account history, as well as loan repayment history from prior loans originated through the SoLo Platform.

26.   Defendant then assembles and analyzes this information to generate an individual "SoLo Score" and "loans repaid" tabulation for each consumer. SoLo provides this information to third-party prospective lenders reviewing a loan request.

27.   In the first 90 days after the due date, if the total amount, inclusive of the Lender fee and SoLo donation fee, is not paid when due, SoLo seeks to collect payments on behalf of the lenders, including communicating directly via texts and emails to demand payment from consumers with allegedly overdue loans.

28.   From approximately March 2018 through December 2022, SoLo

brokered 543,021 loans on its Platform, resulting in $12,945,777 in Lender tip fees, $6,860,642 in borrower-paid Donation fees, and $2,467,211 in other borrower-paid fees. It continues to broker loans on its Platform, and according to its website, as of May 2024, there have now been 1,047,569 total loans to borrowers on its Platform.

### SoLo's Advertising Claims

29.    From at least March 2019 through at least October 2021, Defendant repeatedly advertised that consumers could obtain small-dollar loans with "no interest," "0% APR," or with "0% interest."

30.    Solo's misrepresentations concerning the terms "no interest," "0% interest loan," and "0% APR" led prospective borrowers to believe that if they obtained a loan, they would be repaying the principal amount without paying interest or additional fees or charges.

31.    Borrowers almost never obtained loans with the terms presented in SoLo's advertisements. To have a loan application funded, nearly every single prospective borrower had to pay a Lender tip fee, a SoLo donation fee, or both, and complete the standard, click-through application process.

32.    In addition, SoLo publicly referred to the Lender tip fee as an "interest rate" on the loan, touting that it was lower than interest charged by other payday lenders.

### SoLo's Loan Request Process

33.    Contrary to the no-interest representations in its advertisements, when a potential borrower clicks through the loan request process, SoLo shows the borrower a screen with an unfilled box, a description of the maximum tip, and a "Recommendation on Tip Amount." Borrowers are encouraged not only to leave a tip but to leave the "maximum possible tip" to

increase the speed and likelihood of the loan request being funded.

34.    Before consumers can complete a loan transaction, they are instructed to "Select a SoLo Donation amount" and presented with three options—each a percentage of the amount of the loan.

35.    Between March 2018 and October 2020, for the SoLo donation amounts, consumers were permitted to select payments of 5%, 6%, or 7% of the principal amount requested, and, after October 2020, consumers could select payments of 7%, 8%, or 9% of the principal amount requested.

36.    SoLo provides no further information or instructions on this page other than the following statement: "SoLo incurs costs to verify each member and process funding and payback transactions. This donation allows us to continue helping others."

37.    SoLo does not provide a "No Donation" or "0%" option, or even a way to click through to the next page without selecting a SoLo donation fee, impeding a consumer's ability to comprehend whether such an option exists.

38.    To change their donation amount, consumers need to separately go to the "Settings" heading under the consumer's "Profile," and toggle off the "donation" setting, which allows the consumer to elect to pay "no donation" on the next loan request. It is the fifth option down buried among "personal info", "card info", "share", and "push notifications."

39.    SoLo does not disclose the "no donation" option during the loan request process or provide any information about how to select "no donation" on the "Help" screen on its Platform.

40.    Contrary to the no-interest representations in its advertisements, unless the user is aware of and makes a certain profile-settings change to the donation setting for that particular loan, the SoLo donation fee is a required

1   step in the loan application process.

2       41.     Upon consummation of a loan agreement, SoLo facilitates two

3   transfers from the lender: (1) the requested loan principal moves to the

4   borrower's Platform account; and (2) the SoLo donation fee is paid by the

5   lender to SoLo. This way, SoLo receives and retains the SoLo donation fee

6   regardless of whether the borrower ever repays the loan and fees.

7                        **SoLo's Disclosures to Borrowers**

8       42.     As part of the loan application and funding process, SoLo provides

9   each borrower with documents including a promissory note and a document

10  titled "Truth in Lending Disclosures," both of which purport to describe the

11  specific terms of the transaction, including the cost of credit.

12      43.     Between March 2018 and May 2021, SoLo's promissory notes stated

13  that the consumer promised to pay the Lender not just the principal amount,

14  but rather "the principal sum borrowed together with tips and or donations."

15      44.     Since May 2021, the promissory notes no longer refer to the Lender

16  tip and SoLo donation fees as "due" or "payable." Instead, the promissory

17  notes suggest that the consumer must repay only the original loan amount.

18  But, in fact, SoLo debits the principal along with Lender tip fee and the SoLo

19  donation fee from the borrower's account on the repayment date.

20      45.     The "Truth in Lending Disclosures" document that SoLo provided to

21  borrowers always represented that the "ANNUAL PERCENTAGE RATE,"

22  which it defined as "The cost of your credit as a yearly rate," was 0%.  The

23  document represented that the "FINANCE CHARGE," which it defined as

24  "The dollar amount the credit will cost you," was $0.

25      46.     Since May 2021, SoLo's "Truth in Lending Disclosures" document

26  does not include the Lender tip fee or the SoLo donation fee in the "total of

27

28

payments" box. Instead, SoLo lists only the principal amount and inputs "$0" as the "amounts paid to others on your behalf," even though almost all SoLo Platform loans include additional payments beyond the loan amount.

47.     This description of the cost of credit is not accurate because, in the vast majority of loans made on SoLo's Platform, the amounts of the Lender tip fee or the SoLo donation fee (or both) are set before the disclosure document is generated. Such fees are costs of credit and result in APRs in excess of 300% in most of the loans extended on the SoLo Platform.

### Providing SoLo Score to Lenders for Borrower Loan Applications

48.     When a consumer applies for a loan on the SoLo Platform, that applicant must authorize SoLo to be able to "utilize data contained in [the] Application, including supporting documentation provided, information related to your social media accounts, and a credit report, to develop a proprietary score (the 'SoLo Score')."

49.     On the SoLo App's "SoLo Marketplace" screen, Lenders receive several pieces of information from SoLo to help decide whether to fund a loan. Alongside the consumer's first name and last name's first initial, requested loan amount, Lender tip fee, and proposed repayment date, SoLo's consumer report provides two notable components: (1) the SoLo Score—SoLo's "assign[ed] . . . score of between 0-100"; and (2) a statement listing the number of repaid SoLo Platform loans.

50.     SoLo claims its proprietary credit score, the SoLo Score, "measure[s] . . . ability to repay. The score . . . predicts . . . ability to repay loans on time."

51.     To compose the SoLo Score, SoLo factors in information gathered from third parties as well. For borrowers using Apple's iPhones, SoLo gathers

information about the borrower's mobile device model and cellular service plan. It gathers similar information from Google for Android mobile phone users. SoLo also collects information from Plaid, Inc. Plaid's product is a platform that enables applications to connect to users' bank accounts. SoLo uses Plaid to gather a borrower's deposit bank information, including the deposit account history, current and historical balances, insufficient funds fees, transaction frequency, and length of depository account history.

52.    After aggregating this consumer financial information, SoLo develops a SoLo Score as a tool for lenders to determine the borrower's ability to repay the loan, sometimes describing the SoLo Score as an "in app credit score" or a "social credit score."

53.    In the process of producing and calculating the SoLo Score, SoLo failed to implement reasonable procedures to assure maximum possible accuracy of this consumer report in at least three respects: (1) SoLo did not have procedures to verify whether the SoLo score reflected all loans that the consumer had repaid on the SoLo Platform; (2) it did not have procedures to detect where either fraud or lender account problems resulted in a borrower appearing overdue on a loan that the borrower had repaid; and (3) it did not have procedures to verify whether the number of repaid loans included in and appearing below the SoLo Score was accurate.

54.    Consumers have complained to SoLo about their SoLo Score and number of loans repaid not being accurate. Nonetheless, SoLo did not make changes to its policies and procedures to monitor whether loans on the platform have been repaid and the exact number of loans repaid, so as to ensure that the consumer's SoLo Score and listed number of loans repaid is as accurate as possible.

55. Since 2018, SoLo has failed to follow reasonable procedures to assure maximum possible accuracy of its consumer reports.

56. In multiple instances, SoLo's failure to have, implement, and follow reasonable procedures to assure maximum possible accuracy of the SoLo Score and number of loans repaid may have led to loan rejections or to loans on worse terms (i.e., higher Lender tip fees, shorter repayment periods, lower dollar amounts) than consumers would have otherwise received.

### SoLo Brokers High-Cost Loans Throughout the United States

57. SoLo has solicited, arranged, facilitated, brokered, procured, received fees in connection with, serviced, and collected on debts arising from high-cost, small-dollar single-repayment loans in nearly all fifty states.

58. Consumers can borrow between $20 and $575 from lenders on SoLo's Platform. The maximum amount a first-time borrower can borrow is $100. These minimum and maximum amounts are all set by SoLo.

59. SoLo previously had not obtained—and, for the most part, still has not obtained—a license to lend, broker, arrange, or provide credit services in any of the States listed in Paragraph 80 that require that such a license to lend to or collect from borrowers in that state. SoLo does not require its lenders to obtain necessary licenses or track whether its lenders have required state licenses.

60. Almost all of SoLo's loans carry an annual percentage rate of over 36% APR, and many loans carry an APR in excess of 300%.

### SoLo's Collection Practices

61. According to its Terms, only SoLo or its agents can attempt to collect on an unpaid loan; Platform lenders are not permitted to communicate with the borrower.

62.    Initially, SoLo facilitated the funding of loans through ACH credit and debit entries. Under the standard loan repayment process, SoLo would use the consumer's deposit account to debit funds on the designated repayment date. Should such debit attempts fail, SoLo attempts to collect and does collect debt by communicating with borrowers via repeated emails and text messages. SoLo's employees generally handle the first 60 or 90 days of collection activity; after that time, SoLo automatically places unpaid loans with its third-party debt collectors to continue to collect debt from the borrowers.

63.    In communications sent to consumers from the SoLo "Collections" team (renamed "Recovery" team), SoLo repeatedly made express misrepresentations to consumers about furnishing information.

64.    For example, 2021 SoLo debt collection emails stated that the Company would report a "derogatory mark" about the consumer to "credit bureaus," which would result in a "negative effect" on the consumer's credit score.

65.    In another example, in use between at least April 2020 and June 2021, SoLo used serial email templates to send emails to consumers with alleged unpaid debts—sending a new email to a borrower every couple of days. Of those, 15 consecutive emails repeat the same statements: "[i]f you do not repay your loan you will be reported to the credit bureaus with a derogatory mark, which could negatively affect your credit score for up to 7 years" and "[r]eporting our members to the credit bureaus is used as a last resort and something we want to avoid."

66.    These collection threats were untrue. SoLo never reported any information to any "credit bureaus," including the three nationwide consumer reporting agencies, as a "last resort" or otherwise.

67.     In addition to express misrepresentations, many SoLo debt collection communications imply that SoLo furnishes negative information to the credit bureaus unless the consumer makes a payment.

68.     SoLo sent emails to borrowers stating, "[w]e'd like to give you another opportunity to settle your loan before it negatively affects your credit score," implying that SoLo *will* report "negative" information about an allegedly unpaid loan, thereby affecting the consumer's credit score.

69.     These SoLo emails are false—SoLo does not make reports to any of the three nationwide consumer reporting agencies. SoLo continued to make similar misrepresentations into 2022. According to email templates used between at least October 5, 2021 to at least February 22, 2022, SoLo told consumers with alleged unpaid debts that, "[f]ailing to pay off your loan could cause derogatory marks to appear in your credit history."

70.     This statement implies that "failing to pay off" the loan will cause SoLo to furnish negative information to the credit bureaus, negatively impacting the consumer's creditworthiness. SoLo's statement is false because SoLo had a practice of never reporting any information to the three nationwide consumer reporting agencies.

71.     Throughout SoLo's collection activities and communications with borrowers, it also never disclosed that any of the loans or related fees may be void or uncollectible if made to borrowers in states for which the loan violated state-law usury limits or violated laws requiring licenses for lenders or brokers.

**State Laws Protecting Consumers on Small-Dollar Loans**

72.     Many states protect consumers from harmful practices associated with originating, brokering or arranging, servicing, and collecting of certain

loans.

73. Such legal protections include licensing requirements, civil and criminal usury limits, and restrictions on the types of entities that may engage in these types of transactions.

74. In some states, loans that violate these laws are declared void, in part or in whole, meaning that the borrower is not obligated to pay some or all the principal, interest, or fees on the loan.

75. SoLo brokered, arranged, facilitated, serviced, solicited, procured, received fees in connection with, serviced, and collected on loans made by unlicensed parties that consumers are not obligated to pay, in whole or in part, based on state licensing regulations or usury caps that render non-compliant loans, such as those offered on SoLo's Platform, void *ab initio*. The States are listed in Paragraphs 77 and 80 and are referred to as Subject States.

## Interest-Rate Caps

76. Interest under state law typically is defined to include the compensation paid to a lender for the use of money or the forbearance of a debt. If the required Lender tip fee and SoLo donation fee are included in the state interest calculations, most loans in the states listed below would have been void for charging interest in excess of the state usury limitation.

77. The following states have enacted laws that render installment loans, even with a single installment payment, void if they exceed the usury limit:

a. Arkansas, in which the state constitution provides that all contracts with interest in excess of 17% "shall be void as to principal and interest . . . ." Ark. Const. amend. 89, §§ 3, 6(b);

b. Connecticut, which voids loans under $5,000 made after July 1, 2016, with interest rates in excess of "the maximum annual percentage rate

for interest that is permitted with respect to the consumer credit extended under the Military Lending Act, 10 U.S.C. 987 et seq.," Conn. Gen. Stat. Ann. § 36a-558(c)(1), (d)(1), meaning a consumer cannot be charged more than the 36% Military Annual Percentage Rate;

c. New Hampshire, which prohibits annual interest rates above 36% for loans of $10,000 or less, N.H. Rev. Stat. §§ 399-A:1(XX), 399-A:16(I); and loans that do not comply with those restrictions are void, and the lender has no right to collect any principal, charges, or recompense, N.H. Rev. Stat. 399-A:23(VIII);

d. New York, which prohibits any person or corporation not licensed by the state of New York from "directly or indirectly charg[ing], tak[ing] or receiv[ing] any interest . . . at a rate exceeding" annual interest of 16% on covered loans, N.Y. Gen. Oblig. Law § 5-501; N.Y. Banking Law § 14-a(1), and loans that exceed the rate are void, N.Y. Gen. Oblig. Law § 5-511; *see also Szerdahelyi v. Harris*, 490 N.E.2d 517, 522-23 (N.Y. 1986) ("[A] usurious transaction is void ab initio . . . .");

e. North Carolina, which imposes a cap on loans $25,000 and under, which is the greater of 16% or the latest published noncompetitive rate for U.S. Treasury bills with a six-month maturity as of the fifteenth day of the month plus six percent (6%) rounded to the nearest one-half of one percent, N.C. Gen. Stat. § 24-1.1(a)(1), (c); and loans $15,000 and under that violate those provisions are void, and the lender has no right to collect, receive, or retain any principal or charges. N.C. Gen. Stat. § 53-166(a), (d);

f. Rhode Island, which imposes a cap of 21% per annum or an alternate rate of 9% per annum plus an index that is the domestic prime rate as published in the Money Rates section of the Wall Street Journal on

the last business day of each month, whichever is greater, R.I. Gen. Laws § 6-26-2, and loans in excess of the applicable limit are usurious and void, R.I. Gen. Laws § 6-26-4;

g.    South Dakota, in which loans made by money lender licensees with an annual percentage rate above 36% are void and uncollectible, and any person evading the usury cap, including by offering loans through the internet or any electronic means, is subject to the same penalties as licensees, S.D. Codified Laws §§ 54-4-44, 54-4-44.1; and

h.    Virginia (since January 1, 2021), which voids loans made with interest rates in excess of 36%, and the lender has no right to collect, receive, or retain any principal, interest, fees, or other charges. Virginia Code § 6.2-303.

78.    These state usury statutes reflect each state's strong public policy interest in ensuring that consumers who lack negotiating power are protected from loans with excessive interest rates.

79.    Loans on the SoLo Platform do not comply with the usury statutes in subparagraphs 77(a) through 77(h).

**Licensing Requirements**

80.    The following states have implemented licensing regimes that include measures aimed at preventing and penalizing harmful consumer lending practices: Alabama, Arizona, Connecticut, Idaho, Illinois, Indiana, Maryland, Massachusetts, Minnesota, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, and Oregon. The licensing regimes in these states reflect substantive consumer-protection concerns by, for instance:

a.    ensuring that licensees possess the requisite character, integrity, and experience (Ariz. Rev. Stat. § 6-603(F)(2); Ind. Code § 24-

4.5-3-503(2); 209 Mass. Code Regs. 20.03(2); N.C. Gen. Stat. § 53-168(a)(2); N.H. Rev. Stat. § 399-A:5(I); N.Y. Banking Law § 342); and

b.    ensuring compliance with loan-term and disclosure regulations by requiring compliance examinations and investigations by state regulators as well as recordkeeping and annual reports (Ariz. Rev. Stat. §§ 6-607, 6-608(A), 6-609(A)-(D); Ind. Code § 24-4.5-3-505; Mass. Gen. Laws ch. 140 §§ 97-99; N.H. Rev. Stat. §§ 399-A:10, 399-A:11; N.Y. Banking Law §§ 348, 349; N.C. Gen. Stat. §§ 53-184).

81.    These state licensing statutes reflect each state's strong public policy interest in ensuring that persons or entities seeking to make loans, arrange or broker loans, or otherwise engage in the consumer-lending business in those states are vetted and supervised by the regulators of those states for compliance with consumer protection and other laws.

82.    The following state laws render covered loans void if they are made without the appropriate license(s) and (i) the unlicensed person or entity has no right to collect from consumers or (ii) the consumers have no obligation to repay certain loan amounts:

a.    Alabama, which voids loan contracts of less than $1,500 that are made by a person in the business of lending and who contracts for, exacts or receives, directly or indirectly, on or in connection with any such loan any charges, including those who seek to evade the licensing requirement by any device, including by receiving or charging compensation for goods or services, whether or not sold, delivered, or provided through negotiation, arrangement, or procurement of a loan through any use of activity of a third person, and the lender has no right to collect, receive, or retain any principal, interest, or charges whatsoever, AL

Stat. § 5-18-4;

b.     Arizona, which voids covered loans of $10,000 or less that are made or procured without a license, and provides that the lender has no right to collect any principal, finance charges, or other fees in repayment of such loans, Ariz. Rev. Stat. §§ 6-601(5)-(7), 6-602(B), 6-603(A), 6-613(B);

c.     Connecticut, which since June 19, 2015, voids loans directly or indirectly arranged in the amount of $15,000 or less and that charge interest in excess of 12%, when made without a license, Conn. Gen. Stat. Ann. § 36a-558(c);

d.     Illinois, which voids consumer-installment loans for principal amounts not exceeding $40,000 made after January 1, 2013, without a license and at interest rates higher than 99% APR for loans up to $1,500, and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan, 205 Ill. Comp. Stat. §§ 670/1, 670/17.2(a)(1), 670/20(d);

e.     Idaho, which voids covered loans made by persons who offer or make a payday loan, or arrange a payday loan for a third-party lender without a license; and provides that such loans shall be uncollectible and unenforceable, Idaho Code Ann. §§ 28-46-401 and -402;

f.     Indiana, which voids covered loans made without a license, and the debtor has no obligation to pay either the principal or finance charges on such loans, Ind. Code §§ 24-4.5-5-202(2), 24-4.5-3-502(3);

g.     Maryland, which voids contracts for credit services by unlicensed credit services businesses and makes such contracts for services from a credit services business void and unenforceable as contrary to the public policy of the state, Md. Code Ann., Com. Law § 14-1903; Md. Code

Ann., Com. Law § 14-1907(b);

h.     Massachusetts, which voids covered loans of $6,000 or less if interest and expenses on the loan exceed 12% a year and the loan is made or purchased without a license; a license is also required of those in the business of negotiating, arranging, aiding or assisting the borrower, or lending, procuring, or making loans; and the lender or purchaser has no right to collect money in repayment of such loans, Mass. Gen. Law. Ch. 140, §§ 96, 110;

i.     Minnesota, which voids regulated loans made or arranged without a required license or that include prohibited loan provisions or interest rates, and requires lenders of up to $100,000 to hold a license in order to issue loans in excess of 21.75% APR, or the total of 33% a year on the part of the unpaid balance up to $1,350 and 19% a year on the part of the unpaid balance above $1,350, Minn. Stat. Ann. §§ 56.01(a), 56.19; Minn. Stat. Ann. §§ 47.59, 47.60, 47.601;

j.     New Hampshire, which voids covered loans of $10,000 or less that are made without a license, and provides that the lender has no right to collect such loans, N.H. Rev. Stat. §§ 399-A:1(XX), 399-A:2(I), 399-A:23 (VII);

k.     New Jersey, which voids consumer loans of $50,000 or less that are made without a license, and provides that the lender has no right to collect or receive any principal, interest, or charges on such loans, unless the act was the result of good faith error, N.J. Rev. Stat. §§ 17:11C-2, 17-11C-3, 17-11C-33(b);

l.     New Mexico, which voids loans of $5,000 or less made by a person with no license, and provides that the lender has no right to collect,

receive, or retain any principal, interest, or charges whatsoever on such loans, N.M. Stat. § 58-15-3;

  m. New York, which voids personal loans of $25,000 or less that are made without a license and where the interest or other charge exceeds that permitted to a licensee, and provides that the lender has no right to collect such loans, N.Y. Banking Law §§ 340, 355;

  n. North Carolina, which voids covered loans of $15,000 or less that are made or secured for repayment without a license and in excess of the state's general usury law, and provides that any party in violation shall not collect, receive, or retain any principal or charges with respect to such loans, N.C. Gen. Stat. § 53-166(a), (d); and

  o. Ohio, which from March 2018 through March 26, 2019, voided loans of $5,000 or less that were made without a small-dollar loan license, and provided that the lender had no right to collect, receive, or retain any principal, interest, or charges on such loans, Ohio Rev. Code Ann. § 1321.02; and, from March 27, 2019 through present, voids covered loans made without a short-term loan license, and provides that the lender has no right to collect, receive, or retain any principal, interest or charges on such loans, Ohio Rev. Code Ann. § 1321.36;

  p. Oregon, which voids covered loans brokered by an unlicensed person and such loans are void, Or. Rev. Stat. Ann. § 725A.020(2);

83. SoLo brokered, arranged, facilitated, serviced, solicited, procured, received fees in connection with, serviced, and collected on loans, including amounts that borrowers were not obligated to repay, made by unlicensed persons and entities in the states described above in Paragraphs 80 and 82.

## VIOLATIONS OF LAW

### The CFPA

84.    Sections 1031 and 1036 of the CFPA prohibit a "covered person" or "service provider" from engaging in any "unfair, deceptive, or abusive act or practice" in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

85.    An act or practice is unfair if it causes or is likely to cause substantial injury to consumers, which is not reasonably avoidable by consumers and such substantial injury is not outweighed by countervailing benefits to consumers or to competition. 12 U.S.C. § 5531(c).

86.    An act or practice is deceptive if it misleads or is likely to mislead consumers acting reasonably under their circumstances, and the misleading act or practice is material, or likely to affect a consumer's choice of, or conduct regarding, the product or service.

87.    An act or practice is abusive if it (1) materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service; or (2) takes unreasonable advantage of (A) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service; (B) the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or (C) the reasonable reliance by the consumer on a covered person to act in the interests of the consumer. 12 U.S.C. § 5531(d).

### FCRA

88.    FCRA was enacted in 1970, became effective on April 25, 1971, and has been in force since that date. The Fair and Accurate Credit Transactions

Act amended FCRA in December 2003, and the Dodd-Frank Act amended FCRA in July 2010.

89. The Bureau is authorized to enforce compliance with FCRA as one of the enumerated consumer laws under the CFPA. 12 U.S.C. § 5481(12)(F); 15 U.S.C. § 1681s(b)(1)(H).

90. Under FCRA, a "consumer reporting agency" includes any person which, (1) "for monetary fees, dues, or on a cooperative nonprofit basis," regularly engages "in whole or in part" in (2) "the practice of assembling or evaluating consumer credit information or other information on consumers" (3) "for the purpose of furnishing consumer reports to third parties," and which "uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports." 15 U.S.C. § 1681a(f).

91. The term "consumer report" includes any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for, among other things, credit or insurance to be used primarily for personal, family, or household purposes. 15 U.S.C. § 1681a(d).

92. One of FCRA's stated purposes is to promote fair and accurate reporting about consumers. 15 U.S.C. § 1681(a)–(b). To that end, it imposes various requirements on consumer reporting agencies. One of those requirements is that consumer reporting agencies "follow reasonable procedures" to ensure "maximum possible accuracy" of information in consumer reports. 15 U.S.C. § 1681e(b).

## Count I: Violation of the CFPA
## Deceptive Advertising

93.    The Bureau incorporates and re-alleges by reference Paragraphs 1-47, 57-60, and 84-87.

94.    From at least March 2019 to October 2021, Defendant represented to consumers that they could obtain loans on SoLo's Platform with "no interest," "0% APR," or "0% interest."

95.    However, SoLo's Platform loans almost uniformly required a Lender tip fee, a SoLo donation fee, or both to be funded.

96.    Defendant's representations in the advertisements were material and likely to mislead consumers acting reasonably under the circumstances.

97.    As a result, Defendant engaged in deceptive acts or practices when it advertised that borrowers could get "no interest," "0% interest," or "0% APR" loans on its Platform, in violation of Sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

## Count II: Violation of CFPA
## Deceptive Disclosures and Documents

98.    The Bureau incorporates and re-alleges by reference Paragraphs 1-47, 57-60, and 84-87.

99.    As part of the loan application and funding process, Defendant provides the borrower with a promissory note and a "Truth in Lending Disclosures" document, both of which purport to describe the specific terms of the transaction, including the cost of credit. Defendant's statements include, but are not limited to:

    a.    The loan amount due at the repayment date is the principal amount only;

     b.    The cost of credit is 0%;

     c.    The finance charge is $0; and

     d.    No amounts were to be paid to others on the consumer's behalf.

100.   These inaccurate statements regarding the costs associated with a SoLo loan are likely to mislead consumers acting reasonably because the vast majority of SoLo Platform loans include Lender tip fees or SoLo donation fees or both, and:

     a.    SoLo debits not only the principal loan amount on the repayment date but also any Lender tip fee and SoLo donation fee;

     b.    These fees render the cost of credit in excess of 0%;

     c.    These fees constitute finance charges and thus the finance charge is not $0; and

     d.    Solo receives a donation fee and transmits Lender tip fees to lenders.

101.   As a result, Defendant engaged in deceptive acts or practices when it issued promissory notes and "Truth in Lending Disclosures" documents that did not include the Lender tip fee and SoLo donation fee in the finance charge, the APR, or the total of payments, in violation of Sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

## Count III: Violation of CFPA

## Abusive Act or Practice of Obscuring "No Donation" Option

102.   The Bureau incorporates and re-alleges by reference Paragraphs 1-47 and 84-87.

103.   An act or practice is abusive under the CFPA if it, among other things, "materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service." 12 U.S.C. § 5531(d)(1).

104.   Defendant designed and implemented a loan request process that: (1) pre-populated three options for payment of a "donation amount;" (2) required borrowers to choose one of those three options to request a loan; and (3) obscured whether and how borrowers can select "no donation."

105.   SoLo's loan request process materially interfered with consumers' ability to understand that the donation fee term or condition on each loan, including whether payment of that fee was required to request a loan from a lender.

106.   As a result, Defendant engaged in abusive acts or practices, in violation of Sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a) and (d)(1), 5536a(1)(B).

## Count IV: Violation of the CFPA
## Deceptive Collection of Amounts Consumers Did Not Owe

107.   The Bureau incorporates and re-alleges by reference Paragraphs 1-47 and 57-87.

108.   Defendant represented expressly in loan documents or by implication through its servicing practices that consumers had an obligation to repay loan amounts when that obligation did not exist because the loans violated Subject States' lender-licensing or usury laws that declared such loans void *ab initio* or limited consumers' obligation to repay.

109.   Defendant reinforced the misrepresentations that consumers were obligated to pay debts that were void or that consumers otherwise were not obligated to repay by actions such as sending collection emails and texts demanding payment from consumers; debiting money from consumers' bank accounts through ACH transactions; and threatening to report nonpayment to the credit bureaus.

110.   For loans governed by laws in states that void the legal obligation to repay a loan in whole or in part, Defendant's repayment demands and collection efforts are deceptive acts or practices because Defendant falsely tells consumers that they are obligated to make payments on their loans.

111.   In its communications with consumers, Defendant fails to inform them that neither SoLo nor the lenders have a legal right to loan repayments and that borrowers have no legal obligation to repay a loan in whole or in part originated in the Subject States.

112.   To the extent a borrower is not under any legal obligation to repay a void loan or a portion of it, Defendant's misrepresentations are material and likely to mislead consumers acting reasonably under the circumstances.

113.   As a result, Defendant engaged in deceptive acts or practices by debiting borrowers' bank accounts and demanding, collecting, or attempting to collect void loans or fees, in violation of Sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

## Count V: Violation of CFPA

## Unfair Collection of Amounts Consumers Did Not Owe

114.   The Bureau incorporates and re-alleges by reference Paragraphs 1-47 and 57-87.

115.   By arranging payments on and collecting on loans that consumers were not obligated to repay, Defendant caused or is likely to cause consumers substantial injury by demanding and obtaining payments from consumers— including not only principal payments, but also payment of significant Lender tip fees and SoLo donation fees (in addition to other fees)—on void or otherwise uncollectible loans, in whole or in part.

116.   These substantial injuries were not reasonably avoidable by

borrowers who were unlikely to know that the usury or licensing requirements in their respective Subject States rendered the loans obtained through the SoLo Platform void or uncollectible in whole or in part. Thus, consumers were unable to avoid paying amounts that SoLo and lenders on its Platform would otherwise not be entitled to receive.

117.   The substantial injuries caused by Defendant's collection of debts that consumers were not obligated to repay are not outweighed by any possible countervailing benefits to consumers or competition.

118.   As a result, Defendant engaged in unfair acts or practices by arranging payments on, collecting, and attempting to collect on loans that consumers were not obligated to repay as void under borrowers' state usury or licensing laws, in violation of Sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(c), 5536(a)(1)(B).

**Count VI: Violation of the CFPA**

**SoLo's Abusive Demands for**

**and Collection of Amounts Consumers Did Not Owe**

119.   The Bureau incorporates and re-alleges by reference Paragraphs 1-47 and 57-87.

120.   A consumer's legal obligation to repay is a material term, cost, and condition of a loan.

121.   Consumers residing in Subject States likely were unaware that SoLo lacked the legal authority to collect because the loans violated their own State's usury or licensing requirements.

122.   Defendant took unreasonable advantage of consumers' lack of understanding regarding the void or uncollectible nature of the loans or the limited obligation to repay by telling consumers that they are obligated to

make payments on void loans, by arranging payments on those void loans, and by collecting debts, or portions thereof, to which SoLo was not legally entitled.

123.   As a result, Defendant engaged in abusive acts or practices by taking unreasonable advantage of consumers' lack of understanding of the material risks, costs, or conditions of their SoLo loans—here, the impacts on their loans of Subject States' usury and lender licensing laws, in violation of Sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(d)(2)(A), 5536(a)(1)(B).

**Count VII: Violation of CFPA**

**Deceptive Use of False Credit Reporting**

**Threats to Consumers**

124.   The Bureau incorporates and re-alleges by reference Paragraphs 1-47, 61-71, and 84-87.

125.   Since at least March 2018, while engaged in debt collection, Defendant has repeatedly misled consumers that it would report their failure to repay loans originated on SoLo's Platform to "credit bureaus" which might affect the consumers' credit scores.

126.   In addition to making express misrepresentations, Defendant misleadingly implies that it will furnish negative information to the credit bureaus unless the consumer makes a payment.

127.   Despite threatening to furnish negative information to the credit bureaus, Defendant did not take, and had no intention of taking, any such action. Defendant reported zero information to the credit bureaus, and it was never equipped to furnish consumer credit information.

128.   Defendant's misrepresentations were material because they compelled consumers to believe that Defendant would report an unpaid loan on behalf of the SoLo Platform lenders, and those misrepresentations were

likely to mislead consumers acting reasonably under the circumstances.

129.   As described, Defendant's unfounded collections-related misrepresentations were deceptive acts and practices in violation of the CFPA, 12 U.S.C. § 5536(a)(1)(B).

## Count VIII: Violation of FCRA

### SoLo's Failure to Follow Reasonable Procedures to Ensure Maximum Possible Accuracy of Consumer Report Information

130.   The Bureau incorporates and re-alleges by reference Paragraphs 1-56, 61-71, and 88-92.

131.   Defendant is a consumer reporting agency under FCRA because, either for monetary fees, or alternatively, on a "cooperative nonprofit basis," it regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers (from Plaid, Apple, Google, and prior Platform loans) to create a "SoLo score" and number of loans repaid for the purpose of providing that information to third parties to be used as a factor in establishing creditworthiness. SoLo uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

132.   Section 607(b) of FCRA, 15 U.S.C. § 1681e(b), requires that, for every consumer report prepared, a consumer reporting agency must "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

133.   Since 2018, Defendant has failed to follow reasonable procedures to assure maximum possible accuracy of its consumer reports.

134.   As a result, Defendant has violated FCRA, 15 U.S.C. § 1681e(b).

## Count IX: Violation of the CFPA
## SoLo's Violation of Federal Consumer Financial Law

135.   The Bureau incorporates and re-alleges by reference Paragraphs 1-56, 61-71, 84-92, and 130-134.

136.   With limited exceptions not relevant here, the CFPA defines "Federal consumer financial law" to include FCRA. 12 U.S.C. § 5481(14).

137.   Under the CFPA, covered persons' or service provider's violations of Federal consumer financial law are violations of Section 1036 of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

138.   As a result, SoLo's violation of FCRA, as described in Count VIII, constitutes a violation of the CFPA. 12 U.S.C. § 5536(a)(1)(A).

## DEMAND FOR RELIEF

139.   The Bureau requests, pursuant to Sections 1054 and 1055 of the CFPA, 12 U.S.C. §§ 5564 and 5565, that the Court:

a.   Permanently enjoin Defendant from committing future violations of the CFPA, the FCRA, or any other provision of "Federal consumer financial law," as defined by 12 U.S.C. § 5481(14);

b.   Grant additional injunctive relief as the Court may deem just and proper;

c.   Award monetary relief against Defendant, including restitution, refund of moneys, disgorgement or compensation for unjust enrichment, and payment of damages;

d.   Award a civil money penalty;

e.   Award costs against Defendant; and

f.   Award additional relief as the Court may determine is just and proper.

Dated: May 17, 2024

Respectfully submitted,

Eric Halperin
*Enforcement Director*
Deborah Morris
*Deputy Enforcement Director*
Michael Favretto
*Assistant Deputy Enforcement Director*


 /s/ Joseph M. Lake
Joseph M. Lake
Bradley H. Cohen (*pro hac vice* pending)
Trishanda L. Treadwell (*pro hac vice* pending)

Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552

*Attorneys for the Consumer Financial Protection Bureau*