THOMAS M. HEFFERON (admitted *pro hac vice*)
*THefferon@goodwinlaw.com*
LEVI W. SWANK (admitted *pro hac vice*)
*LSwank@goodwinlaw.com*
**GOODWIN PROCTER LLP**
1900 N Street, NW
Washington, DC  20036
Tel.: +1 202 346 4000
Fax: +1 202 346 4444

LAURA A. STOLL (SBN 255023)
*LStoll@goodwinlaw.com*
**GOODWIN PROCTER LLP**
601 S. Figueroa Street, 41st Floor
Los Angeles, CA  90017
Tel.: +1 213 426 2500
Fax: +1 213 623 1673

Attorneys for Defendant
SOLO FUNDS, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION – LOS ANGELES

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>           Plaintiff,<br><br>     v.<br><br>SOLO FUNDS, INC.,<br><br>           Defendant. | Case No. 2:24-cv-04108-RGK-AJR<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT SOLO FUNDS, INC.'S MOTION TO DISMISS COMPLAINT**<br><br>Date:    September 16, 2024<br>Time:   9:00 am<br>Ctrm:   850 (8th Fl.)<br>Judge:  Hon. R. Gary Klausner<br>        Roybal Federal Building<br>        255 East Temple Street<br>        Los Angeles, CA 90012 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................1

LEGAL STANDARD ...........................................................................................3

ARGUMENT........................................................................................................3

I.    This Lawsuit Was Filed and Is Being Prosecuted Using Funds Obtained in Violation of the Bureau's Enabling Statute and the Constitution. ...........3

II.   The Complaint Fails to Plausibly Allege Deceptive Advertising (Count I)........................................................................................................6

    A. The Complaint fails to plausibly allege that the overall net impression of SoLo's advertising statements was misleading. ....................................6

    B. Even when viewed in isolation, SoLo's advertising statements were not deceptive because "no interest," "0% APR," and "0% interest" loans could be obtained on the SoLo marketplace. ............................................7

        1.   Optional tips and donations are neither "interest" nor amounts factored into an "APR." .....................................................................7

        2.   Loans with no tips or donations were requested and funded on the SoLo marketplace. .........................................................................9

III.  The Complaint Fails to Plausibly Allege That SoLo's Loan Disclosure Documents Were Deceptive (Count II). ......................................................10

    A. SoLo's disclosure documents were not false. ..........................................10

    B. The Complaint fails to raise a plausible inference that any inaccuracies in SoLo's disclosures were likely to materially mislead a reasonable consumer. ................................................................................................12

IV.   The Bureau Has Failed to Plausibly Plead a CFPA Claim Predicated on Purported Violations of State Law (Counts IV-VI). ...................................13

    A. Failing to disclose a potential legal defense to enforceability of a loan is not a violation of the CFPA....................................................................13

    B. The Bureau's conclusory allegations of violations of state law are insufficient to state a claim. ...................................................................15

    C. Many of the state licensing laws are inapplicable on their face. ..............16

    D. The Complaint fails to state an unfairness claim (Count V) for additional reasons....................................................................................18

V.    The Complaint Fails to Allege a FCRA Claim (Counts VIII-IX)...............19

- i -

CONCLUSION ......................................................................................21

LOCAL RULE 11-6.1 CERTIFICATION...........................................................23

- ii -

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................. 3, 10

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................... 3

*CFPB v. CashCall, Inc.*,
   No. 15-7522, 2016 WL 4820635 (C.D. Cal. Aug. 31, 2016) .......................... 13

*CFPB v. Gordon*,
   819 F.3d 1179 (9th Cir. 2016) .............................................................. 6, 12

*CFPB v. Nationwide Biweekly Admin., Inc.*,
   No. 15-02106, 2017 WL 3948396 (N.D. Cal. Sept. 8, 2017) ........................ 12

*Consumer Financial Protection Bureau v. Community Financial
   Services Association of America, Ltd.*,
   601 U.S. 416 (2024) .............................................................................. 2, 4

*FTC v. NPB Advert., Inc.*,
   218 F. Supp. 3d 1352 (M.D. Fla. 2016) .................................................... 6

*Hammond v. Reeves*,
   552 P.2d 1237 (N.M. Ct. App. 1976) ...................................................... 17

*Moritz v. Daniel N. Gordon, P.C.*,
   895 F. Supp. 2d 1097 (W.D. Wash. 2012) ............................................... 13

*In re Opana ER Antitrust Litig.*,
   162 F. Supp. 3d 704 (N.D. Ill. 2016) ................................................. 15, 16

*Matter of Rhone-Poulenc Rorer, Inc.*,
   51 F.3d 1293 (7th Cir. 1995) .................................................................. 16

*Salvate v. Auto. Restyling Concepts, Inc.*,
   No. 13-2898, 2014 WL 6901788 (D. Minn. Dec. 5, 2014) ............................. 9

- iii -

*Sandofsky v. Google LLC*,
No. 21-10052, 2021 WL 2941128 (D. Mass. July 13, 2021), *aff'd*,
No. 21-1628, 2023 WL 9785578 (1st Cir. Sept. 6, 2023) ................................ 20

*Scott v. IndyMac Bank, FSB*,
No. 03-6489, 2005 WL 730961 (N.D. Ill. Mar. 28, 2005) ................................ 9

*State v. Leeth*,
67 So. 2d 46 (Ala. Ct. App. 1952) .................................................................. 17

*Tavernaro v. Pioneer Credit Recovery, Inc.*,
43 F.4th 1062 (10th Cir. 2022) ........................................................................ 6

*Tierney v. Advoc. Health & Hosps. Corp.*,
797 F.3d 449 (7th Cir. 2015) ..................................................................... 20, 21

*Veale v. Citibank, F.S.B.*,
85 F.3d 577 (11th Cir. 1996) ........................................................................... 9

*Wade v. Reg'l Credit Ass'n*,
87 F.3d 1098 (9th Cir. 1996) .......................................................................... 13

*Woodward v. Collection Consultants of Cal.*,
381 F. Supp. 3d 1234 (C.D. Cal. 2019), *aff'd*, 801 F. App'x 521
(9th Cir. 2020) ........................................................................................... 14, 15

**Statutes:**

5 U.S.C. §706(2) .............................................................................................. 11

12 U.S.C. §289(a)(2) ......................................................................................... 4

12 U.S.C. §289(a)(3) ......................................................................................... 4

12 U.S.C. §5328 ................................................................................................. 5

12 U.S.C. §5345(c) ............................................................................................ 5

12 U.S.C. §5497(a)(1) ....................................................................................... 4

12 U.S.C. §5497(a)(1)-(2) ................................................................................. 4

12 U.S.C. §5497(e)(1)(A) .................................................................................. 5

12 U.S.C. §5531(c) ...................................................................................... 18, 19

15 U.S.C. §1602(g) ................................................................................ 11

15 U.S.C. §1605(a) .................................................................................. 8

15 U.S.C. §1605(a)(1) ............................................................................. 8

15 U.S.C. §1681a(f) ............................................................................... 20

205 Ill. Comp. Stat. §670/1 .................................................................. 16

Ala. Code §5-18-4 ................................................................................. 16

Idaho Stat. §28-46-402 ......................................................................... 17

Mass. Gen. Laws ch. 140, §§96, 110 ................................................... 17

Minn. Stat. §56.01(a) ............................................................................ 16

N.C. Gen. Stat. §53-166 ........................................................................ 17

N.H. Rev. Stat. §399-A:2 ...................................................................... 17

N.J. Rev. Stat. §17:11C-2-17:11C-3 .................................................... 16

N.M. Stat. §58-15-3 ........................................................................ 16, 17

N.Y. Banking Law §340 ................................................................... 16, 17

Ohio Rev. Code. §1321.02 .................................................................... 17

**Regulations:**

12 C.F.R. §1026.4(a) ......................................................................... 8, 11

12 C.F.R. §1026.18(c) ........................................................................... 11

12 C.F.R. §1026.22(a)(1) ........................................................................ 8

**Other Authorities:**

*Earnings*, Merriam-Webster's Collegiate Dictionary (11th ed. 2007) ...................... 4

*Earnings*, Nasdaq, Glossary,
    https://www.nasdaq.com/glossary/e/earnings (accessed August 14,
    2024) ............................................................................................... 4

- v -

*Earnings*, Oxford Dictionary of Accounting (4th ed. 2010) ...................................... 4

*Earnings*, Webster's Third New Int'l Dictionary (3d ed. 2002) .............................. 4

Fed. Trade Comm'n Staff Rpt., *40 Years of Experience With the Fair Credit Reporting Act*, 2011 WL 3020575 (July 2011)...................................... 21

U.S. Const. art. I, §9, cl. 7 ......................................................................................... 4

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES     Case No. 2:24-cv-04108-RGK-AJR

## **INTRODUCTION**

Over one-third of consumers do not have cash or savings to cover a $400 unexpected emergency expense.  *See* Declaration of Levi W. Swank ("Swank Decl."), Ex. 1 at 31-32.  Despite that obvious need, the legacy financial system offers no good solutions.  Few mainstream companies offer small-dollar loans, so the only options for many are payday loans, title loans, or the like.  For some consumers, such as those with low or inconsistent income, or with no or seriously impaired credit or assets, even these types of "options" are out of reach.

SoLo Funds, Inc. offers solutions to these market failures.  Since 2018, SoLo has operated a peer-to-peer community marketplace where consumers can request short-term, small-dollar loans from other consumers in amounts ranging from $20 to $575.  ECF No. 1 ("Compl.") ¶¶18, 20, 24.  Over 1 million consumers have used the SoLo marketplace to meet their emergency financial needs – on terms workable for both sides.  *Id.* ¶28.

Unlike other financing, the SoLo marketplace is available to consumers regardless of their credit score or unemployment status. Compl. ¶¶48-52.  Consumers looking to borrow money select the terms of their loan request, including the repayment date, loan amount, and any tip or donation.  *Id.* ¶¶33, 38.  Lender tips, made to the consumer who funds the loan request, and donations, made to SoLo, are optional. *Id.* ¶¶33-35.  Consumers looking to lend money peruse loan requests posted on the SoLo platform and, if acceptable, agree to be the lender.  Each loan provides for "a single repayment date" (*i.e.*, no serial rollovers), and while the term of the loan may be "as short as a few days," late fees are assessed only if the loan is not repaid within thirty-five days.  *Id.* ¶20.

This lawsuit's challenges to SoLo's innovative consumer loan marketplace are flatly inconsistent with these obvious benefits and the hundreds of thousands of satisfied (and grateful) consumers.  That the Consumer Financial Protection Bureau rushed to file this enforcement action mere hours after the Supreme Court rendered

its decision in *Consumer Financial Protection Bureau v. Community Financial Services Association of America, Ltd.*, 601 U.S. 416 (2024) ("*CFSA*"), which rejected an argument that the Bureau's funding mechanism was improper, is telling.  In its haste to file this lawsuit, however, the Bureau has failed to allege plausible claims for relief and pled nothing that undermines the obvious and important benefits of the SoLo platform.

First, the Court should dismiss this lawsuit with prejudice without assessing the sufficiency of the Bureau's allegations, because the Bureau filed and is litigating this lawsuit using funds obtained in violation of statutory limits on its funding imposed by its enabling statute, the Dodd-Frank Act.  This failing was not addressed in the *CFSA* decision.  As a result, the Bureau has no lawful authority to prosecute this enforcement action.

Second, Counts I and II should be dismissed because they are predicated on an implausible theory that SoLo violated the Consumer Financial Protection Act ("CFPA"), by inaccurately describing loans with *optional* tips or donations as "0% interest," "0% APR," or "no interest" and failing to disclose any tips or donations in loan documents as "finance charges" or the "cost of credit."  Optional payments do not, as a matter of law, constitute "interest," "finance charges," the "cost of credit," or amounts factored into an "APR."  If the Bureau wants to regulate optional tips and donations (or even to redefine terms like "finance charge"), its only potential option is to exercise its rulemaking authority.  Instead of doing so, it asks this Court to fashion a new financing disclosure regime under the guise of enforcing the CFPA. The Court should reject that invitation.

Third, Counts IV-VI offer the theory that the loans violated sixteen *state* licensing and eight *state* usury laws, and so the Bureau gets to sue SoLo under the CFPA.  To be clear, the CFPA does not deputize the Bureau as an enforcement agent for purported state-law violations.  Nevertheless, in an improper attempt to grab that role anyway, the Bureau argues that loans made to borrowers in those states are void,

and SoLo engaged in unfair, deceptive, and abusive acts or practices when SoLo failed to disclose this alleged legal defense to enforceability of those loans. The theory has no legal support, and, even if it did, the Bureau has failed to plead facts demonstrating that even a single one of the referenced state laws applies here, let alone has been violated by SoLo. To the contrary, even a cursory review of the state licensing laws referenced in the Complaint, for example, reveals that the majority are facially inapplicable.

Fourth, Counts VIII and IX fail to plausibly allege unrelated claims that SoLo's preparation and disclosure of a borrower's repayment activity on the SoLo marketplace violates the Fair Credit Reporting Act ("FCRA"). That law applies only to a "consumer reporting agency," but SoLo is not one.[1]

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and quotation marks omitted). "[L]abels and conclusions," a "formulaic recitation of the elements of a cause of action," and "naked assertion[s]" devoid of "further factual enhancement" are insufficient. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007).

## ARGUMENT

I. **THIS LAWSUIT WAS FILED AND IS BEING PROSECUTED USING FUNDS OBTAINED IN VIOLATION OF THE BUREAU'S ENABLING STATUTE AND THE CONSTITUTION.**

This enforcement action suffers from a fatal, threshold infirmity that requires dismissal with prejudice: it is being litigated with funds transferred to the Bureau in violation of statutory restrictions on the Bureau's funding and, therefore, in violation

---

[1] The Bureau's lack of statutorily-authorized funds with which to prosecute this lawsuit is a threshold issue that warrants dismissal of the Complaint in full. SoLo is not otherwise moving to dismiss Counts III and VII.

3

of the Appropriations Clause's mandate that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. art. I, §9, cl. 7.  Under the Dodd-Frank Act, the Bureau funds its operations by making a demand of the Federal Reserve in "the amount determined by the [Bureau's] Director to be reasonably necessary to carry out" its operations, subject to a cap of twelve percent of the total operating expenses of the Federal Reserve.   12 U.S.C. §5497(a)(1)-(2).   Those funds may come, however, only "from the combined *earnings* of the Federal Reserve System."  *Id.* §5497(a)(1) (emphasis added).

The "earnings" of the Federal Reserve are its *net* earnings – *i.e.*, revenues in excess of liabilities.  The Supreme Court recognized as much in *CFSA*.  It held that the Appropriations Clause applies to the Bureau's funding, because the funds derive from the "*surplus funds* in the Federal Reserve System [that] would otherwise be deposited into the general fund of the Treasury."  601 U.S. at 425 (emphasis added); *see* 12 U.S.C. §289(a)(3) (directing transfer of surplus funds to the Treasury).  The Federal Reserve's "surplus fund[s]" are its "*net* earnings."  12 U.S.C. §289(a)(2) (emphasis added).

The plain meaning of the term "earnings" (which the Dodd-Frank Act does not define) confirms this interpretation.  "Earnings" means "net income" – *i.e.*, income in excess of liabilities.  *See Earnings*, Oxford Dictionary of Accounting (4th ed. 2010) (defining "earnings" as "[t]he net income or profit of a business"); Nasdaq, Glossary (defining "earnings" as "[n]et income for the company during a period")[2]; Webster's Third New Int'l Dictionary 714 (3d ed. 2002) (defining "earnings" as "[t]he balance of revenue for a specific period that remains after deducting related costs and expenses."); Merriam-Webster's Collegiate Dictionary 391 (11th ed. 2007) (defining "earnings" as "the balance of revenue after deduction of costs and expenses").  Thus, the Bureau's funding must come from the combined net income or profits of the Federal Reserve System.

---

[2] https://www.nasdaq.com/glossary/e/earnings (accessed August 14, 2024).

Since September 2022, the Federal Reserve has had no net earnings or profits. Swank Decl., Ex. 2.  For the year ending December 31, 2023, the Federal Reserve reported a cumulative "deferred asset" amount of $133.3 billion, which "represents the net accumulation of costs in excess of earnings." *Id*., Ex. 3.  The Federal Reserve continues to operate at a loss, reporting a deferred asset of $175 billion as of last month.  *Id*., Ex. 4 at 48.  Despite its lack of earnings, the Federal Reserve has continued to transfer funds to the Bureau.  *Id*., Ex. 5 at 4 (reporting transfer of $315 million for first quarter of FY 2024).  These transfers are, as the Bureau acknowledges, the "principal[]" means by which "[t]he CFPB is funded."  *Id*.  Thus, the Bureau filed and is prosecuting this lawsuit using funds transferred in violation of its enabling statute.

The requirement that the Bureau's funding come from the combined "earnings" of the Federal Reserve System stands in stark contrast to how Congress chose to fund the Financial Stability Oversight Council and the Office of Financial Research – both also created by the Dodd-Frank Act.  For the first two years of its existence, the expenses of the Oversight Council were "treated as expenses of, and paid by, the Office of Financial Research," 12 U.S.C. §5328, which was funded by the Federal Reserve in "an amount sufficient to cover the expenses of the Office," *id*. §5345(c).  Congress could have chosen to fund the Bureau from any source of revenue at the Federal Reserve's disposal.  Instead, it limited the Bureau's funding to a specific source:  the combined "earnings" of the Federal Reserve System.

This is not to say that the Bureau must cease operations until the Federal Reserve returns to profitability.  If the "sums available to the Bureau" from the Federal Reserve are "not … sufficient to carry out [its] authorities," the Bureau may seek appropriations directly from Congress.  12 U.S.C. §5497(e)(1)(A).  But the Bureau may not flout its enabling statute and bypass Congress by using unlawfully requisitioned funds to prosecute this enforcement action.  The Court should dismiss the Complaint with prejudice.

## II.   THE COMPLAINT FAILS TO PLAUSIBLY ALLEGE DECEPTIVE ADVERTISING (COUNT I).

Count I alleges that because marketplace "loans almost uniformly required a Lender tip fee, a SoLo donation fee, or both to be funded," SoLo violated the CFPA by deceptively advertising that consumers could obtain loans on the SoLo marketplace with "no interest," "0% APR," or "0% interest."  Compl. ¶¶93-97.

An act or practice is deceptive if "(1) there is a representation, omission, or practice that (2) is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material." *CFPB v. Gordon*, 819 F.3d 1179, 1192-93 (9th Cir. 2016) (citation and quotation marks omitted).  The Bureau has failed to state a deceptive acts or practices claim.

### A.   The Complaint fails to plausibly allege that the overall net impression of SoLo's advertising statements was misleading.

To determine whether an advertising statement is misleading, courts evaluate the statement in the context of the entire advertisement, transaction, or course of dealing, to determine whether the overall "net impression" is misleading to a reasonable consumer. *See Gordon*, 819 F.3d at 1193.  A court must assume that "the reasonable consumer would read a communication in its entirety and make sense of a communication by assessing it as a whole and in its context." *Tavernaro v. Pioneer Credit Recovery, Inc.*, 43 F.4th 1062, 1072 (10th Cir. 2022).

The Bureau asserts that three phrases it plucked from SoLo's advertisements – "no interest," "0% interest," and "0% APR" – are deceptive.  Compl.  ¶¶4, 29-32, 93-96.  But nowhere does the Bureau plead the facts required to plausibly allege deceptive advertising – for example, the full content of the advertisements, the form they took, other statements, representations, or clarifications that accompanied them, or the target audience.  The Bureau instead bases its claim solely on these three phrases in isolation, even though "[a]n advertisement's 'overall impression,' not an isolated word or phrase, determines the representation conveyed." *FTC v. NPB*

6

*Advert., Inc.*, 218 F. Supp. 3d 1352, 1358 (M.D. Fla. 2016) (citation omitted).

The full context and content of the advertisements in which these slogans appeared is critical here, given the unique nature of the SoLo marketplace. Unlike other financing, the borrower proposes the terms of their loan request and other consumers decide whether to fund them. Under these circumstances, the phrases "no interest," "0% interest," and "0% APR" are best understood to reflect the optionality inherent in a marketplace where the borrower can request loans with "no interest," "0% interest," and "0% APR" and lenders can choose to fund those loans. But because SoLo does not itself fund loans, its advertisements cannot reasonably be understood to make an unconditional promise that any specific loan request would be funded.

The Bureau also assumes – without any supporting factual allegations – that a reasonable consumer would have understood the phrases "no interest," "0% interest," and "0% APR" to preclude optional tips or donations. Referencing the terms "APR" or "interest" in these advertising slogans, however, does not plausibly create an impression that there would be no other financial terms associated with a marketplace loan (*e.g.*, late fees). Without more, the Bureau has failed to plausibly allege that the overall net impression of SoLo's advertising statements was deceptive.

**B.    Even when viewed in isolation, SoLo's advertising statements were not deceptive because "no interest," "0% APR," and "0% interest" loans could be obtained on the SoLo marketplace.**

**1.    Optional tips and donations are neither "interest" nor amounts factored into an "APR."**

The Bureau's deceptive advertising claim is predicated on its view that optional tips and donations are "interest" and/or are amounts factored into an "APR." They are neither. As a result, every loan requested and/or funded on the SoLo marketplace had the advertised characteristics, whether or not a tip or donation was paid.

7

1    Under the Bureau's Regulation Z, which implements the Truth in Lending Act
2    ("TILA"), an "annual percentage rate is a measure of the cost of credit, expressed as
3    a yearly rate," 12 C.F.R. §1026.22(a)(1), equivalent to the "finance charge," which
4    is "the cost of consumer credit as a dollar amount," *id*. §1026.4(a).  Regulation Z
5    defines a "finance charge" to include "any charge payable directly or indirectly by
6    the consumer and imposed directly or indirectly by the creditor as an incident to or a
7    condition of the extension of credit."  *Id*.; *see also* 15 U.S.C. §1605(a).  "Interest" is
8    one example of a type of finance charge.  15 U.S.C. §1605(a)(1).  Thus, TILA and
9    Regulation Z make clear that not all amounts paid by a consumer in connection with
10   financing are a form of "interest" or required to be calculated as part of the "APR."
11   Rather, the amount must be, among other characteristics, "imposed directly or
12   indirectly by the creditor as an incident to or a condition of the extension of credit."
13   12 C.F.R. §1026.4(a).

14   Here, optional tips and donations are not charges "imposed … by the creditor
15   as an incident to or a condition of the extension of credit."  12 C.F.R. §1026.4(a).
16   Instead, tips and donations are *optional* amounts *voluntarily* offered by the borrower
17   as a token of appreciation for a funded loan request.  Compl. ¶21 (alleging the
18   "prospective borrower [] set[s] the Lender tip" and "can request a loan with a $0 tip").
19   The loan request process itself makes clear that tips are optional, as the prospective
20   borrower is shown "a screen with an unfilled box," and can enter "a $0 tip."  *Id*. ¶33.
21   Likewise, "consumers could select" the amount of any donation, and could "elect to
22   pay 'no donation'" at all by disabling that feature.  *Id.* ¶¶34-35, 38.  Nor do these
23   amounts compound or increase over time if unpaid, as "interest" typically would.

24   That tips and donations are optional payments is further confirmed by the
25   promissory note that SoLo provided to borrowers on behalf of marketplace lenders.
26   *See* Declaration of Travis Holoway ("Holoway Decl."), Ex. 9.  The promissory note
27   states that tips and donations are "purely voluntary" and not "a condition of the
28   Loan."  *Id*.  If, as here, "the borrower can choose to avoid the [] fee," "then the fee is

8

not imposed as an incident to the extension of credit." *Veale v. Citibank, F.S.B.*, 85 F.3d 577, 579 (11th Cir. 1996). Although the Complaint alleges that SoLo "prompted," "encouraged," and "[r]ecommend[ed]" tips and donations, Compl. ¶¶4-5, 33, it does not plausibly allege that offering a tip or donation was *required* to obtain financing. *See, e.g.*, *Scott v. IndyMac Bank, FSB*, No. 03-6489, 2005 WL 730961, at *2 (N.D. Ill. Mar. 28, 2005) (holding that a fee is not a finance charge "unless it was required" by the lender); *Salvate v. Auto. Restyling Concepts, Inc.*, No. 13-2898, 2014 WL 6901788, at *3 (D. Minn. Dec. 5, 2014) (holding that because a payment was "not required by [lender] as a condition of financing" it was "not incident to the extension of credit and therefore not a finance charge").

## 2. Loans with no tips or donations were requested and funded on the SoLo marketplace.

Even if optional tips and donations are "interest" or amounts factored into an "APR," the Complaint still fails to state a claim for deceptive advertising because consumers could request and obtain financing on the SoLo marketplace *without* paying a tip or donation. Compl. ¶¶4, 29, 94 (asserting that SoLo falsely stated in advertisements that "consumers could obtain financing" on these terms). The Complaint acknowledges that lenders have funded *thousands* of loans with no lender tip offered. *Compare id*. ¶28 (total marketplace originations), *with id*. ¶21 (percent of originations with tip). The Complaint also acknowledges that consumers could disable donations, *id*. ¶38, though the Complaint is conspicuously silent about the number or percentage of funded loans that included no donation. Thus, regardless of how optional tips and donations are denominated, consumers could, in fact, obtain a loan with "no interest," "0% APR," and "0% interest."

The Bureau attempts to bridge this plausibility gap by asserting that marketplace "loans *almost* uniformly required a Lender tip fee, a SoLo donation fee, or both to be funded." Compl. ¶95 (emphasis added). But the "almost" confirms that *some* loans were funded without a lender tip or donation – meaning SoLo's alleged

9

1  advertising was accurate.  In any event, the sole alleged fact relied on by the Bureau

2  to support this assertion is that "only 0.5% of loans funded on the SoLo Platform did

3  not include a Lender tip."  *Id*. ¶21.  This statistic is perfectly consistent with the

4  overwhelming majority of borrowers offering lender tips, but it says nothing about

5  whether loans with no tip offered were funded on the marketplace.  According to the

6  Complaint, many loans were.  Because the statistic alleged by the Bureau is "merely

7  consistent with" its theory of deception, this allegation "stops short of the line

8  between possibility and plausibility."  *Iqbal*, 556 U.S. at 678.

9  **III.  THE COMPLAINT FAILS TO PLAUSIBLY ALLEGE THAT SOLO'S LOAN**

10     **DISCLOSURE DOCUMENTS WERE DECEPTIVE (COUNT II).**

11     In Count II, the Bureau alleges that the promissory note and Truth in Lending

12  Disclosures document ("TILA disclosure") that SoLo provided to borrowers during

13  the loan application process on behalf of marketplace lenders were deceptive because

14  they falsely stated that "[t]he loan amount due at the repayment date is the principal

15  amount only," "[t]he cost of credit is 0%," "[t]he finance charge is $0," and "[n]o

16  amounts were to be paid to others on the consumer's behalf."  Compl. ¶99.  These

17  statements supposedly were false because "the vast majority of SoLo Platform loans

18  include Lender tip fees or SoLo donation fees or both."  *Id.* ¶100.  Count II fails to

19  state a claim because SoLo's disclosures were not false, and the Bureau has not

20  plausibly pled they were likely to mislead a reasonable consumer.

21     **A.     SoLo's disclosure documents were not false.**

22     As an initial matter, the disclosures SoLo provided on behalf of marketplace

23  lenders were not false.  As to the promissory note, it contains none of the four

24  statements the Bureau alleges are false.  Rather than specify, as the Bureau asserts,

25  that the amount due on the repayment date is the principal amount only, the

26  promissory note explicitly references tips and donations and states that "the principal

27  sum borrowed together with all other charges, costs and expenses, is due and

28  payable" on the repayment date.  Holoway Decl., Ex. 9.  Nor does the promissory

10

note say anything about the "cost of credit," "finance charge," or "amounts … paid to others on the consumer's behalf."  Compl. ¶99.

As to the TILA disclosure, TILA and Regulation Z dictate the form, manner, and content of the "cost of credit," "finance charge," "amounts paid to others on the consumer's behalf," and the "total of payments" disclosures.[3]  TILA does not apply here, however, because consumers who fund loans on the SoLo marketplace do not, on the whole, "regularly extend[] … consumer credit."  15 U.S.C. §1602(g).  The Bureau has not alleged otherwise.

Nonetheless, and although it was not required to, SoLo voluntarily provided a TILA disclosure on behalf of lenders to give borrowers additional information concerning the terms of their loans.  But no statute or regulation specifies how optional tip or donation amounts should be disclosed to borrowers.  As explained above (at 7-9), tips and donations are not the "cost of credit" or a "finance charge," because they are not amounts "imposed … by the creditor as an incident to or a condition of the extension of credit."  12 C.F.R. §1026.4(a).  Nor are tips and donations "amounts … paid to others on the consumer's behalf," as they are not "amount[s] financed" by the consumer.  *Id.* §1026.18(c).  Finally, the "total of payments" box need only reflect the principal amount of the loan plus the finance or interest charges (*i.e.*, the cost of credit), and tips and donations are neither finance nor interest charges.

The Bureau should not be permitted to use this enforcement action to impose new disclosure requirements.  The only possible recourse for the Bureau to attempt to do so is by amending Regulation Z through rulemaking, subject to the procedural protections of the Administrative Procedure Act, 5 U.S.C. §706(2).  Rather than propose such a rule, the Bureau asks this Court to impose a new disclosure regime

---

[3] The statement "[t]he loan amount due at the repayment date is the principal amount only" does not appear in either disclosure.  SoLo assumes the Bureau is referencing the "total of payments" box on the Truth in Lending Disclosures.

by judicial fiat under the guise of a CFPA claim. The Court should decline that invitation.

**B.**    **The Complaint fails to raise a plausible inference that any inaccuracies in SoLo's disclosures were likely to materially mislead a reasonable consumer.**

Even if the promissory note and TILA disclosure were inaccurate, any inaccuracies, when viewed in the context of the transaction and parties' course of dealing as a whole, were not "likely to mislead consumers acting reasonably under the circumstances." *Gordon*, 819 F.3d at 1192 (citation omitted).

The crux of the Bureau's theory of deception is that SoLo's promissory notes and TILA disclosures inaccurately conveyed that "the consumer must repay only the original loan amount" and not any optional tips or donations the consumer had also agreed to pay. Compl. ¶¶44, 46. In the context of the entire loan transaction, however, no reasonable borrower could have been misled as to their agreement to pay any optional tips or donations offered. The borrower – not SoLo or the lender – chose the primary terms of their loan request during the loan request process, including any tip or donation. *Id.* ¶¶33-34. It is during this same process that SoLo provided each borrower with their promissory note and TILA disclosure. *Id.* ¶42. It is highly implausible that any borrower – having just decided to offer a tip or donation and in what amount – would interpret the contemporaneously provided disclosures to mean that SoLo would not debit those amounts on their loan's repayment date. *See CFPB v. Nationwide Biweekly Admin., Inc.*, No. 15-02106, 2017 WL 3948396, at *3 (N.D. Cal. Sept. 8, 2017) (deception under the CFPA "requires something that misleads more than only the most gullible or inattentive").

The promissory note SoLo provided to prospective borrowers during the loan request process reinforces that no reasonable consumer could have been misled. The note explicitly references the existence of "Lender Tips" and the "Platform Donation," both of which it describes as "purely voluntary" payments that the

12

borrower "chooses to make." Holoway Decl., Ex. 9. The promissory note also makes clear that the borrower has agreed to pay "the principal sum borrowed together with all other charges, costs, and expenses." *Id.* Thus, based on the totality of the circumstances, no reasonable borrower could have been misled as to their agreement to pay any optional tip or donation amounts on their loan's repayment date.

## IV. THE BUREAU HAS FAILED TO PLAUSIBLY PLEAD A CFPA CLAIM PREDICATED ON PURPORTED VIOLATIONS OF STATE LAW (COUNTS IV-VI).

The heart of the Complaint is the allegations underlying Counts IV-VI that certain marketplace loans violated state law and are void, and that the Bureau can enforce those laws under the guise of the CFPA's prohibition on deceptive, unfair, and abusive acts or practices against SoLo for collecting on loans that consumers allegedly were not obligated to repay. Compl. ¶¶107-23. Specifically, the Bureau contends that consumers were not obligated to repay loans where "the loans were not made by a licensed person or entity" (in sixteen states) and/or "the loans were in excess of state usury limitations" (in eight states). *Id.* ¶8. These allegations fail to state a CFPA claim.

### A. Failing to disclose a potential legal defense to enforceability of a loan is not a violation of the CFPA.

"Congress did not intend to turn every violation of state law into a violation of the CFPA." *CFPB v. CashCall, Inc.*, No. 15-7522, 2016 WL 4820635, at *12 (C.D. Cal. Aug. 31, 2016). Instead, "[t]he proper question is whether the CFPB has alleged, and proven, that Defendants have engaged in conduct that falls within the broad range of conduct prohibited by the CFPA," *id.*, "independent of any state-law violation," *Moritz v. Daniel N. Gordon, P.C.*, 895 F. Supp. 2d 1097, 1108 (W.D. Wash. 2012); *see also Wade v. Reg'l Credit Ass'n*, 87 F.3d 1098 (9th Cir. 1996).

The Complaint alleges no representation made by SoLo – either in advertising, loan documents, or collection notices – that either it or marketplace lenders are licensed under state law, or that marketplace loans comply with state usury statutes.

13

Instead, the Bureau asserts that "[c]onsumers ... likely were unaware that SoLo lacked the legal authority to collect [on] the loans," Compl. ¶121, and SoLo "fail[ed] to inform them that neither SoLo nor the lender have a legal right to loan repayments," *id.* ¶111. Reduced to its essence, therefore, the Bureau's theory in Counts IV-VI is that SoLo violated the CFPA by failing to *affirmatively disclose* to consumers a potential state-law defense to the enforceability of their loans. But this attempt to bootstrap a federal claim to alleged violations of state law would convert every instance where a consumer may have a theoretical legal defense into a "deceptive," "unfair," and "abusive" failure to disclose that defense to consumers. The argument has essentially no cabining principle – such as, how good a defense must be before it must be disclosed, and how much the company can explain about why the defense is wrong – and would sow much more confusion than clarity. Courts have rejected this argument in other contexts, and this Court should do the same here. *See, e.g., Woodward v. Collection Consultants of Cal.*, 381 F. Supp. 3d 1234, 1236-38 (C.D. Cal. 2019) (rejecting FDCPA claim arising from attempt to collect on time-barred debt), *aff'd*, 801 F. App'x 521 (9th Cir. 2020).

To be sure, Count IV does assert certain other predicate acts, but none gives rise to a plausible claim. The Bureau says that SoLo misrepresented consumers' obligation to repay by "debiting money from consumers' bank accounts." Compl. ¶109. But initiating a debit transaction from a consumer's account is not a representation, let alone a misrepresentation. The Bureau also asserts that SoLo "represented expressly in loan documents ... that consumers had an obligation to repay loan amounts" and also alludes to unspecified "collection emails and texts," *id.* ¶¶108, 109, but the Complaint fails to identify the content of these alleged representations. Such allegations are required to state a plausible claim because, absent more, merely communicating with a borrower about an unenforceable outstanding debt is not a false, deceptive, or misleading representation. *See Woodward*, 381 F. Supp. 3d at 1239.

**B.    The Bureau's conclusory allegations of violations of state law are insufficient to state a claim.**

Even if the Bureau were permitted to proceed on its effort to federalize state law through the CFPA, it has not plausibly alleged the violation of any state law.

As an initial matter, it is not clear from the Complaint *who* the Bureau believes has violated the dozens of referenced state laws or is required to be licensed, and in which States.  The Complaint appears to assert that the consumers who funded loans on the SoLo marketplace were required to obtain a license.  *E.g.*, Compl. ¶¶8, 59, 75 (noting that SoLo brokered loans that were "made by unlicensed parties").  Elsewhere, however, it appears to assert that SoLo is required to obtain a license, even though it was not the lender.  *E.g.*, *id.* ¶¶59, 82(p).

In any event, to the extent the Bureau contends that SoLo was required to obtain a license because it "solicited," "brokered," "arranged," "facilitated," or "procured" loans, this word-salad falls far short of raising a plausible claim for relief.  It is entirely unclear from the Complaint what facts, if any, the Bureau believes indicate that SoLo "solicited," "brokered," "arranged," "facilitated," and "procured" loans.  Merely reciting these terms is insufficient to state a plausible claim; they are not well-pled facts, but rather legal terms and elements of the state law on which the Bureau's CFPA claim relies.

If that were not enough, the Bureau also assumes that these terms have the same meaning under the laws of all sixteen states – a preposterous notion.  So the Bureau has not only failed to plead the facts that, if proven, would establish that SoLo has "brokered" loans as a general matter, but it has also failed to plead the specific facts that would establish that SoLo has "brokered" loans for purposes of each of the sixteen states' laws referenced in the Complaint.  Instead, the Complaint throws the laws of these sixteen states into a blender, "fail[ing] to account for any consequential differences that may exist among the undifferentiated state-laws[s]."  *In re Opana ER Antitrust Litig.*, 162 F. Supp. 3d 704, 726 (N.D. Ill. 2016).  The Bureau has thus

15

"not truly pleaded claims under those laws sufficient to show [its] entitlement to recovery." *Id.* (emphasis omitted); *see also Matter of Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1302 (7th Cir. 1995) (rejecting argument that defendant's liability could be determined "under a law that is merely an amalgam, an averaging, of the [] laws of 51 jurisdictions").

The Complaint approaches the eight state usury statutes in much the same way. Rather than plausibly plead that optional tips and donations constitute "interest" under each of the referenced States' laws, the Complaint seeks to allege a violation of all eight state laws by applying an apparent definition of "interest" that is supposedly "typical[]" of state law, though not alleged to be true as to any one (let alone all) of the state laws identified in the Complaint. Compl. ¶76. Even under this general formulation, unmoored from any specific state law, no rationale is proffered for denominating optional tips and donations as "compensation" paid to a lender under state law. (Donations are not even paid to the lender, let alone compensation to them.) The Complaint's threadbare generalizations of dozens of separate state licensing and usury laws fall far short of pleading a plausible claim.

## C.  Many of the state licensing laws are inapplicable on their face.

Although more is not necessary, even a cursory examination of a subset of the referenced state laws shows they do not apply to marketplace loans, rendering the Bureau's assertions of state law violations wholly implausible.

Six of the state licensing laws the Bureau references apply only to persons engaged in the business of making loans or lending.[4]  For example, Alabama voids certain loans "that are made by a person in the business of lending." Compl. ¶82a; *see* Ala. Code §5-18-4. The Complaint alleges that marketplace loans are made by "individual consumers" (*i.e.*, persons not in the business of lending) who "fund loan requests [and] become lenders." Compl. ¶24. Under Alabama law, individual

---

[4] Ala. Code §5-18-4; 205 Ill. Comp. Stat. §670/1; Minn. Stat. §56.01(a); N.J. Rev. Stat. §17:11C-2-17:11C-3; N.M. Stat. §58-15-3; N.Y. Banking Law §340.

consumers "loaning their own money" are "clear[ly] and explicit[ly]" "exempt from license" requirements.  *State v. Leeth*, 67 So. 2d 46, 47 (Ala. Ct. App. 1952).

Similarly, New Mexico requires licensure only for persons who "engage in the business of lending," N.M. Stat. §58-15-3, but the "[o]ccasional isolated acts of loaning money to accommodate one's customers and friends do not constitute 'engaging in the business' of loaning money."  *Hammond v. Reeves*, 552 P.2d 1237, 1239 (N.M. Ct. App. 1976) (citation omitted) (holding that lender that "made a relatively small number of loans" and had "another business from which he presumably obtained the majority of his income" had not engaged in the business of making loans).

Likewise, New York requires licensure only for persons "engage[d] in the business of making loans," which requires the person to both "solicit[] loans" and "in connection with such solicitation, make[] loans to individuals."  N.Y. Banking Law §340.  SoLo does not "make[] loans" and marketplace lenders do not "solicit[] loans," so New York law does not require that either be licensed.  Even if it were otherwise, Section 340 explicitly excludes "isolated, incidental or occasional transactions which otherwise meet the requirements of this section," such as the marketplace originations here.

Five additional states – Ohio, North Carolina, New Hampshire, Idaho, and Massachusetts – explicitly define the business of making loans or lending more broadly, to encompass related activities such as procuring, assisting, brokering, or soliciting a loan.[5]  The Bureau asserts (without factual enhancement) that SoLo has engaged in each of these activities.  But where, as here, the person making the loan (the consumer) is not subject to the licensure requirement, it would make little sense for state legislatures to have intended to void, as to the lender, an otherwise enforceable loan merely because an unlicensed person allegedly assisted the lender

---

[5] Ohio Rev. Code. §1321.02; N.C. Gen. Stat. §53-166; N.H. Rev. Stat. §399-A:2; Idaho Stat. §28-46-402; Mass. Gen. Laws ch. 140, §§96, 110.

in procuring it. In the absence of any clear legislative intent or caselaw to the contrary, adopting such a radical position should be left to state licensing authorities and state courts interpreting their own laws.

### D. The Complaint fails to state an unfairness claim (Count V) for additional reasons.

Even if there were state law violations, and even if the Bureau's self-appointment as a roving ombudsman to enforce state law was permissible, Count V should also be dismissed because it alleges no facts to support the required elements of its claim that SoLo engaged in "unfair" conduct. An act or practice is unfair only if the Bureau can show (a) a "substantial injury" to consumers; and (b) that the asserted consumer injury "is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. §5531(c). The Complaint fails to allege either element, so Count V should be dismissed.

To satisfy the duty to plead a substantial injury, the Bureau says consumers repaid loans where state law might have relieved them of that obligation. *See* Compl. ¶115. That is far from enough. The Bureau does not offer any facts that would permit a trier of fact to find that a consumer who repays a small-dollar loan that they took out from another consumer days or weeks before, and used the funds for immediate personal needs, was harmed *substantially* by paying the small loan back (along with any modest, optional fees that they also agreed to) to that other consumer.

The Bureau's sole allegation as to the weight of benefits is also conclusory. *See* Compl. ¶117. Although not SoLo's burden to plead or prove, substantial countervailing benefits to both consumers and competition are apparent on the face of the Complaint. The Bureau has "recogniz[ed] the need for emergency credit," such as that available through the SoLo marketplace. Swank Decl., Ex. 6. But, as the Bureau has also recognized, consumers with low income or no credit or seriously impaired credit have few options to obtain emergency financing. Some consumers may obtain a payday loan, but the Bureau has accused payday lenders of preying on

consumers, particularly through pattens of loan rollovers and upcharges that create "a long[]-term debt trap." *Id.*, Ex. 7.  Other consumers, for whom even a payday loan is unattainable, turn to loan sharks or internet message boards, such as Reddit, to seek needed funds.  The Bureau has thus urged the industry "to develop a more vibrant, competitive market for small consumer loans." *Id.*, Ex. 8.

SoLo provides a more equitable, transparent, and empowering option to meet short-term emergency credit needs – even for consumers without credit scores or traditional credit histories or with no or seriously impaired credit who may have no other financing options.  *See* Compl. ¶25 (discussing components of SoLo Score).  Consumers also benefit by being able to request loans on terms that meet their financial needs, without hidden fees and debt traps.  *Id.* ¶¶20, 33, 38.  And if consumers cannot repay their loans, SoLo does not report derogatory information to credit bureaus.  *Id.* ¶70.

The Bureau also ignores the clear and direct countervailing benefit that SoLo's collection activities provide to the consumers who fund loans on the marketplace and are owed repayment.  *See* Compl. ¶¶24, 41.  In the absence of SoLo's collection activities, these consumers would be out-of-pocket the principal amount of the loan they funded and the amount of any optional tip amount offered by the borrower.

Finally, the Complaint conveniently ignores the burden on the lenders that the Bureau seeks to create.  Counts IV-VI essentially seek to invalidate thousands of loans that have been repaid to those consumers, putting them in jeopardy.  For all of these reasons, the Complaint fails to present a plausible claim that the asserted consumer injury "is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. §5531(c).

## V.    THE COMPLAINT FAILS TO ALLEGE A FCRA CLAIM (COUNTS VIII-IX).

Counts VIII-IX allege that SoLo violated the FCRA by failing to follow reasonable procedures to ensure maximum possible accuracy in its "consumer reports."  Compl. ¶¶130-38.  (Count IX is a CFPA claim that is derivative of the

19

FCRA claim.)  Although the Bureau acknowledges that SoLo has not furnished any consumer information to credit reporting agencies, *id.* ¶10, it contends that SoLo is itself a "consumer reporting agency" because it makes available on the marketplace interface a borrower's "SoLo score" and number of loans repaid, both of which allegedly constitute "consumer reports."  *Id.* ¶131.  But SoLo is not a "consumer reporting agency," and so FCRA is inapplicable.

FCRA defines "consumer reporting agency" as "any person which, *for monetary fees, dues, or on a cooperative nonprofit basis*, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties."  15 U.S.C. §1681a(f) (emphasis added).  The Complaint alleges that SoLo assembles and provides this information "for monetary fees in the form of SoLo donation fees." Compl. ¶17.  But it is not enough that "[a]n entity … make[s] money" and reports consumer information; rather, the entity "must make money *in exchange for* providing consumer reports in order to be considered a 'consumer reporting agency.'"  *Sandofsky v. Google LLC*, No. 21-10052, 2021 WL 2941128, at *4 (D. Mass. July 13, 2021) (emphasis added) (citation omitted), *aff'd*, No. 21-1628, 2023 WL 9785578 (1st Cir. Sept. 6, 2023); *see also Tierney v. Advoc. Health & Hosps. Corp.*, 797 F.3d 449, 452 (7th Cir. 2015).

Here, there is no plausible basis to infer that SoLo receives donations for assembling a borrower's SoLo Score.  SoLo receives donations, if at all, only after a loan has been funded – not after it makes available a borrower's SoLo Score to prospective marketplace lenders – and it makes a borrower's SoLo Score available to prospective lenders even if no donation is made.  Further illustrating the lack of a direct exchange, SoLo provides the borrower's SoLo Score and number of loans repaid to prospective lenders, whereas donations are made, if at all, by borrowers. *See* Compl. ¶¶25, 34, 100(a).

The Bureau alternatively asserts that SoLo prepares consumer reports on a

20

"cooperative nonprofit basis."  But the Complaint does not allege that SoLo is a "cooperative" or a "nonprofit," let alone both.  *See* Compl. ¶2.  Nor does it allege that consumer information is being shared on a "cooperative [] basis."  Meeting this element requires more than the mere sharing of information with a third-party; otherwise the statute's requirement that the sharing be "for monetary fees, dues, or on a cooperative nonprofit basis" would be superfluous.  Sharing information on a cooperative basis requires the *mutual* sharing of information.  *See* Fed. Trade Comm'n Staff Rpt., *40 Years of Experience With the Fair Credit Reporting Act*, 2011 WL 3020575, at *21-22 (July 2011) (noting that a loan exchange may be a cooperative nonprofit where each member owns and operates the cooperative and each "provide[s]" and "receive[s]" information); *Tierney*, 797 F.3d at 453 (allegation that information was shared with third party insufficient because no allegation of "cooperative sharing of information").  Here, the Complaint exclusively alleges that information is being shared one way – that "SoLo [] provides this SoLo Score to prospective lenders."  Compl. ¶9.  It alleges no mutual exchange of information and thus fails to plausibly allege that SoLo provides consumer information on a "cooperative nonprofit basis."

## **CONCLUSION**

The Court should dismiss this case with prejudice.

1
2

Respectfully submitted,

3    Dated:  August 15, 2024        By:   /s/ Laura A. Stoll
4                                         THOMAS M. HEFFERON (admitted *pro hac vice*)
5                                         THefferon@goodwinlaw.com
                                          LAURA A. STOLL (SBN 255023)
6                                         LStoll@goodwinlaw.com
                                          LEVI W. SWANK (admitted *pro hac vice*)
7                                         LSwank@goodwinlaw.com
8                                         **GOODWIN PROCTER LLP**

9                                         Attorneys for Defendant
                                          SOLO FUNDS, INC.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **LOCAL RULE 11-6.1 CERTIFICATION**

The undersigned counsel of record for Defendant SOLO FUNDS, INC. certifies that this memorandum of points and authorities contains 6,997 words, which complies with the page and word limits set forth in the Court's order of August 8, 2024 (ECF No. 22).

Dated:   August 15, 2024

*/s/ Laura A. Stoll*

LAURA A. STOLL

1

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Central District of California by using the CM/ECF system on **August 15, 2024**.  I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I certify under penalty of perjury that the foregoing is true and correct. Executed on **August 15, 2024**.

Dated:   August 15, 2024

_____
*/s/ Laura A. Stoll*
LAURA A. STOLL

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES     Case No. 2:24-cv-04108-RGK-AJR