THOMAS M. HEFFERON (admitted *pro hac vice*)
*THefferon@goodwinlaw.com*
LEVI W. SWANK (admitted *pro hac vice*)
*LSwank@goodwinlaw.com*
**GOODWIN PROCTER LLP**
1900 N Street, NW
Washington, DC  20036
Tel.: +1 202 346 4000
Fax: +1 202 346 4444

LAURA A. STOLL (SBN 255023)
*LStoll@goodwinlaw.com*
**GOODWIN PROCTER LLP**
601 S. Figueroa Street, 41st Floor
Los Angeles, CA  90017
Tel.: +1 213 426 2500
Fax: +1 213 623 1673

Attorneys for Defendant
SOLO FUNDS, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION – LOS ANGELES

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br><br>                Plaintiff,<br><br>        v.<br><br>SOLO FUNDS, INC.,<br><br>                Defendant. | Case No. 2:24-cv-04108-RGK-AJR<br><br>**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT SOLO FUNDS, INC.'S MOTION TO DISMISS AMENDED COMPLAINT**<br><br>Date:   October 7, 2024<br>Time:   9:00 am<br>Ctrm:   850 (8th Fl.)<br>Judge:  Hon. R. Gary Klausner<br>        Roybal Federal Building<br>        255 East Temple Street<br>        Los Angeles, CA 90012 |

# TABLE OF CONTENTS

**Page**

ARGUMENT.................................................................................................................1

I.    This Suit Is Being Prosecuted Using Unlawfully Obtained Funds. ..............1

II.   The Bureau Has Not Alleged Deceptive Advertising (Count I). ..................2

III.  The Bureau Has Not Alleged Deceptive Disclosures (Count II). .................4

IV.  The Bureau Has No State-Law Based CFPA Claim (Counts IV-VI). ..........5

V.   The Complaint Fails to Allege a FCRA Claim (Counts VIII-IX).................9

CONCLUSION........................................................................................................10

- i -

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Abdallah v. LexisNexis Risk Solutions FL Inc.*,
  2021 WL 1209419 (E.D.N.Y. Mar. 30, 2021) ...................................................... 10

*CFPB v. CashCall, Inc.*,
  35 F.4th 734 (9th Cir. 2022)............................................................................... 5, 6

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
  601 U.S. 416 (2024) ............................................................................................... 1

*CFPB v. Think Finance, LLC*,
  2018 WL 3707911 (D. Mont. Aug. 3, 2018)...................................................... 5, 6

*FTC v. LendingClub Corp.*,
  2018 WL 11436309 (N.D. Cal. Oct. 3, 2018)........................................................ 3

*Sandofsky v. Google LLC*,
  2021 WL 2941128 (D. Mass. July 13, 2021) ........................................................ 9

*Tierney v. Advoc. Health & Hosps. Corp.*,
  797 F.3d 449 (7th Cir. 2015).............................................................................. 10

*Woodward v. Collection Consultants of California*,
  381 F. Supp. 3d 1234 (C.D. Cal. 2019)................................................................. 6

**Statutes:**

5 U.S.C. § 706.............................................................................................................2

12 U.S.C. § 289(a)(2) ................................................................................................1

12 U.S.C. § 290...........................................................................................................1

12 U.S.C. § 5390(n)(2) ..............................................................................................1

12 U.S.C. § 5465(c) ...................................................................................................1

12 U.S.C. § 5497(a) ...................................................................................................2

15 U.S.C. § 1681a(f).................................................................................................10

- ii -

31 U.S.C. § 1341 ....................................................................................................... 2

**Regulation:**

12 C.F.R. § 1026.4(a) ............................................................................................... 4

**Other Authority:**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ............................................................................................... 1

- iii -

## ARGUMENT

**I.    THIS SUIT IS BEING PROSECUTED USING UNLAWFULLY OBTAINED FUNDS.**

The Bureau does not dispute that the Federal Reserve has no net income. Instead, it argues that the term "earnings" in the CFPA means *gross* income, notwithstanding the dictionary definitions that reflect otherwise, because "[t]here is no reason to think Congress meant to use 'earnings' in th[e] private-company sense." Opp. 4-5. But the "combined earnings" referred to in the statute are the earnings of the twelve banks that comprise the Federal Reserve System, each of which has the hallmarks of private corporations, including, for example, having shareholders and issuing dividends. SoLo's proffered definitions more accurately reflect the meaning of "earnings" in this specific context.

The plain meaning of "earnings" as referring to net income is also consistent with the Supreme Court's discussion in *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd. ("CFSA")*, which characterized the Bureau's funding as coming from the "*surplus funds* in the Federal Reserve System [that] would otherwise be deposited into the general fund of the Treasury." 601 U.S. 416, 425 (2024) (emphasis added); *see* Mot. 4. Gross revenues are not surplus funds. The Bureau is thus wrong that *CFSA* is irrelevant because "the meaning of 'earnings' was not at issue" (Opp. 4); there, as here, the Federal Reserve's "earnings" was the sole source of the Bureau's funding.

The Bureau's reliance (Opp. 4, 5) on other sections of the U.S. Code is misplaced. Two of the sections were neither part of, nor amended by, the CFPA, *see* 12 U.S.C. §§ 289(a)(2), 290, and so are irrelevant to the meaning of "earnings" used in *this* statute. *Accord* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 172-173 (2012). The two other provisions the Bureau cites use the term "earnings" to refer specifically to investment returns of third-party entities. *See* 12 U.S.C. § 5390(n)(2) (FDIC); *id.* § 5465(c) (financial market utilities). By contrast, the Bureau's funding provision has no such contextual limitation—it refers to the total "combined earnings of the Federal Reserve System," which in this

1

context most naturally refers to net earnings.  Mot. 4 (citation omitted).

Nor is the Bureau's preferred reading "needed to make the statutory scheme work."  Opp. 5.  As the Bureau begrudgingly concedes (*id.*), the CFPA authorizes the Bureau to request appropriations from Congress if the Federal Reserve's "combined earnings" are insufficient.  *See* 12 U.S.C. § 5497(e).  The Bureau's suggestion (Opp. 6) that this would somehow require courts "to audit both the Federal Reserve Banks . . . and Bureau" (*i.e.*, do math) is pure hyperbole, and, in any event, courts routinely resolve far more complex matters of financial accounting.

Finally, the Bureau complains about the remedy for its violation, arguing that *Congress* "has not provided that actions taken without proper funding must be undone" (Opp. 6), but the Anti-Deficiency Act ("ADA") does not displace a *court's* authority to set aside agency action carried out with unlawfully obtained funds.  *E.g.*, 5 U.S.C. § 706.  Even if the ADA itself does not require dismissal of this case, it prohibits the Bureau from continuing to prosecute it.  *See* 31 U.S.C. § 1341.

**II.   THE BUREAU HAS NOT ALLEGED DECEPTIVE ADVERTISING (COUNT I).**

Failure to Allege Facts to Show the "Overall Net Impression" was Misleading (Mot. 6-7):  The Bureau doubles down on its threadbare allegations that the phrases "no interest," "0% interest," and "0% APR" in isolation are misleading, choosing not to respond to SoLo's showing (at 6-7) that the advertisements were not plausibly false or misleading when taken in their full context.  There was no "bait-and-switch" (Opp. 7), as the optionality inherent in the SoLo peer-to-peer community marketplace was expressly invoked in the advertisements themselves and was reinforced through the loan request process.[1]

Moreover, even stripped of their context, the Bureau essentially concedes that it has no facts to support its allegation that a reasonable consumer would understand the phrases "no interest," "0% interest," and "0% APR" to mean or imply that there

---

[1] Unsurprisingly, the Bureau's one-sided complaint does not set out a full factual picture.  But even what is alleged – without proof of any facts from SoLo – fails to state a claim.

2

could never be any costs for the loan, such as fees or charges, tips, or donations. Mot. 7. The Bureau argues that it is "not required to allege that consumers were actually deceived," only that they were "likely to be misled." Opp. 7. But despite soliciting consumer complaints and commissioning market surveys, not to mention the multi-year pre-suit investigation of SoLo itself, the Bureau has alleged no facts plausibly indicating that any consumer was even likely to be misled. The Bureau's belief that something happened does not free it of its obligation to proffer plausible factual allegations. The facts alleged here stand in stark contrast to those in *FTC v. LendingClub Corp.*, 2018 WL 11436309 (N.D. Cal. Oct. 3, 2018), where the court found a "no hidden fees" representation deceptive because an "origination fee" had not been disclosed during the application process. *Id.* at *6-8.

Tips and Donations are Neither "Interest" Nor Part of an "APR" (Mot. 7-8): Even if technical definitions in lending laws governed how reasonable consumers would have interpreted the terms "interest" or "APR," tips and donations are neither because they are not amounts "imposed" by lenders, but are rather amounts offered by prospective borrowers. The Bureau does not appear to dispute that optional fees or donations are not "finance charges," "interest," or "APR" for purposes of TILA or Regulation Z, disputing only that the tips and donations here were optional. Opp. 8-9. But the Bureau's own allegations belie its assertion that tips and donations are always "mandatory." Opp. 16-17.

The alleged facts the Bureau points to (even if assumed true) do not plausibly support a conclusion that these amounts were mandatory. To start, that consumers were required "to designate a lender tip *before* a lender even considers the loan for funding" is irrelevant, because consumers could propose no tip. Opp. 8; *see, e.g.*, AC ¶43. The Bureau does not dispute that thousands of tip-free loans were proposed by consumers and actually funded. That nearly all funded loans had lender tips says nothing about whether tips were "imposed" by the lender—only that nearly all borrowers offered lender tips. Mot. 9-10. The same is true in a variety of other

3

contexts where no one would dispute that the tip was not "mandatory"—*e.g.*, tipping a server or food-delivery driver. The Bureau also alleges that SoLo "referred to the 'tips' as an interest rate on the loan." Opp. 9 (citing AC ¶42). The Bureau does not allege where these purported "public[]" statements were made, their context, or even that they appeared in advertising. *See* AC ¶42. In any event, allegations that SoLo referenced "interest" charged by "payday lenders" (*id.*), to illustrate the substantial cost savings of a marketplace loan does not mean that the tips were interest or that a consumer would have reasonably believed them to be.[2] Turning to donations, the Bureau asserts that some consumers were unaware how to "toggle off the 'donation' setting" (AC ¶48), although it acknowledges the setting could be disabled and avoids, for obvious reasons, pleading any facts concerning the hundreds of thousands of funded loans with no donations. In any event, the relative ease with which a user interface could be navigated—the subject of Count III—does not convert an optional donation into a "condition of the extension of credit." 12 C.F.R. § 1026.4(a).

**III.   THE BUREAU HAS NOT ALLEGED DECEPTIVE DISCLOSURES (COUNT II).**

The Bureau does not dispute that TILA and Regulation Z do not apply here, but offers no argument for why it nonetheless should be permitted to dictate a specific disclosure regime for tips and donations using the mechanism of a CFPA claim. Once again, rather than meaningfully responding to SoLo's showing (at 10-11) that none of the challenged statements is false or misleading, the Bureau opts to repeat its allegations and pronounce them good enough. Opp. 10. This is non-responsive.

The Bureau then erects a strawman, accusing SoLo of arguing that "buried statements" in the promissory note "cured" its representations. Opp. 11. But the note

---

[2] The Bureau's allegation that lenders made "counteroffers for tip amounts" (Opp. 9) does not render tips and donations "finance charges," "interest" or part of an "APR." At most, this would render only those tips where a counteroffer was made a "finance charge" or part of an "APR." Even in that scenario, the Bureau does not plausibly allege that lenders whose "counteroffers" were refused did not routinely fund the loan after the borrower had "post[ed] another loan request on the SoLo Platform" (AC ¶31), with a lower or no tip amount offered, or that the borrower could not obtain a loan on their original terms (including with no tip) from a different lender.

4

counts: the full context of the consumer's experience must be considered by a trier of fact to determine whether the "overall net impression" was misleading.  Here, the Bureau offers no rebuttal to SoLo's showing (at 10-11) that the alleged facts render the Bureau's claim in Count II implausible:  the borrower set the primary terms of their loan, including the amount of any tip or donation; the borrower's loan disclosures were provided contemporaneously with that decision; and the first page of the promissory note explicitly and conspicuously identifies tips and donations as voluntary payments a borrower may choose to make.  Mot. 11-12.  Instead, the Bureau attacks a materiality argument that SoLo did not make.

**IV.  THE BUREAU HAS NO STATE-LAW BASED CFPA CLAIM (COUNTS IV-VI).**

Failure-to-Disclose-a-Legal-Defense Theory does not Make Out a Claim (Mot. 13-14):  At bottom, the Bureau's theory is that SoLo violated the CFPA by failing to affirmatively disclose a potential state-law defense to the enforceability of their loans—an unworkable and unbounded theory that has no basis in the CFPA.

The Bureau responds that *CFPB v. CashCall, Inc.*, 35 F.4th 734 (9th Cir. 2022), "unambiguously held" that "servicing and collection of loans void under state law is a deceptive act or practice."  Opp. 12.  But there, the Court found that the Bureau had plausibly alleged that CashCall had represented "that consumers were legally obligated to pay" their unenforceable loan.  *CashCall, Inc.*, 35 F.4th at 740. The same was true in *CFPB v. Think Finance, LLC*, 2018 WL 3707911 (D. Mont. Aug. 3, 2018).  *See* Opp. 12 (asserting that Think Finance "informed consumers . . . that they possessed a legal obligation to pay on void loans").

Here, by contrast, the Bureau does not plausibly allege any affirmative representations by SoLo that it or marketplace lenders were licensed under state law, the loans complied with state usury limitations, or that consumers had a legal obligation to repay them.  The Bureau says that SoLo affirmatively misrepresented consumers' obligation to repay by "debit[ing] money from consumers' bank accounts" (Opp. 13), but initiating a debit transaction from a consumer's account is

5

not a representation at all, let alone a misrepresentation. The Bureau also asserts that SoLo "made express representations in its loan documents that consumers had an obligation to replay loans" (*id.*), but it fails to plead the content of these alleged representations.    Finally, the Bureau references "collection emails and texts" concerning payment and credit reporting (*id.* (citing AC ¶¶84-92))—none of which represents, expressly or impliedly, that consumers had a legal obligation to repay their loans and which, in any event, are the subject of a separate CFPA claim (Count VII). Merely communicating with a borrower concerning an unenforceable loan is not unfair, deceptive, or abusive.  The Bureau attempts to distinguish *Woodward v. Collection Consultants of California*, 381 F. Supp. 3d 1234, 1236-38 (C.D. Cal. 2019), *aff'd*, 801 F. App'x 521 (9th Cir. 2020), on the grounds that the communications there concerned "valid" unenforceable debts, whereas here the communications concern "never valid" unenforceable debts (Opp. 13), but that distinction makes no difference.[3]

The State Licensure Theory is Implausible (Mot. 14-15):  The Bureau raises three meritless arguments in response to SoLo's showing that the Bureau's conclusory allegations that SoLo violated state licensing laws are insufficient to state a claim and wrong as a matter of law.  Mot. 14-18.  First, the Bureau expands its word-salad to now also assert, for the first time, that SoLo "finds," "obtains," and "negotiates" loans, which was not even asserted, let alone plausibly pled, in the Complaint.  Opp. 13-14.  To take just one example, the Complaint does not allege that SoLo played any role in negotiating the terms of any loan, or that the terms were even subject to negotiation between borrowers and lenders, except (allegedly) in one narrow circumstance (counteroffers).  In any event, the Bureau says that all of these state laws, which it concedes "var[y] from state to state," apply because SoLo (i) "recruit[s] lenders"; (ii) "establish[es] a loan request process, counteroffer, and

---

[3] Given the alleged factual differences, it should come as no surprise that the argument SoLo makes here was not even briefed by the parties in *CashCall* or *Think Finance*, let alone an issue decided in these cases.

DEFENDANT'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES    No. 2:24-cv-04108-RGK-AJR

acceptance process"; and (iii) "services" loans. *Id.* But the Complaint alleges nothing about how SoLo "recruit[s] lenders" to the marketplace, even if as a legal matter that constituted finding or procuring. The Bureau also has not plausibly pled that SoLo's establishment of a marketplace where loans could be requested and accepted by third parties means it has engaged in any of the activities for which licensure is required. Finally, SoLo does not contest that it services loans, but none of the licensure statutes requires servicers to be licensed. *See* AC ¶¶103-05.

Second, the Bureau argues that SoLo otherwise engages in the "business of lending" or "making loans" because SoLo guarantees, endorses, or takes assignment of "some loans." Opp. 14. Based on the Complaint, this theory is limited to just two states—North Carolina and New Jersey. AC ¶105. And, as to these states, the Bureau confirms that its theory is essentially the same as its anti-evasion theory: that SoLo should be considered "the lender" because the SoLo marketplace is a "device, subterfuge or pretense" to avoid licensure. Opp. 14-15. This is wrong for a plethora of reasons. Despite a multi-year pre-suit investigation, there are no facts pled in the Complaint raising a plausible inference that SoLo created and designed the marketplace to evade licensure. The Bureau did not even attempt to respond to SoLo's showing (at 16-17) that those facts that are alleged establish that marketplace lenders (not SoLo) make the loans and are the true lender. And even if the Court determined it were appropriate to police state licensure statutes under the CFPA, predicating that decision on anti-evasion concerns would eviscerate core principles of federalism and the prerogative of the states to decide, as a matter of both law and policy, the circumstances under which persons not otherwise covered explicitly by the statute should nonetheless be subject to it. The Bureau's pivot to an anti-evasion theory is even more inappropriate (and telling) as to the three states—New Mexico, Alabama, and New York—where SoLo demonstrated (at 16), based on the clear language of the statute and binding caselaw, that neither SoLo nor marketplace lenders were required to be licensed.

7

Finally, the Bureau argues that the laws of six states required that a subset of consumer lenders (those making "25 or more loans") be licensed. Opp. 16. But SoLo established (at 17) that there was no legal support for the proposition that making 25 loans over the span of five years (which *is* what the Complaint alleges) requires that a consumer be licensed. The Bureau does not cite a single statute, regulation, or other source of authority to the contrary. Regardless, the Bureau has no answer to SoLo's showing (at 17) that none of the relevant statutes requires licensure of a company that allegedly "facilitates" unlicensed lending by others.

<u>The State Usury Theory Also is Implausible (Mot. 15)</u>: The Bureau's failure to meaningfully contest SoLo's showing (at 8) that tips and donations do not meet the relevant definitions in TILA and Regulation Z dooms its theory that tips and donations render marketplace loans in violation of nine state usury statutes, as the Bureau acknowledges that state usury limits are often predicated on these definitions. *See* AC ¶97. The Bureau asserts (at 17 n.13) that the views of the attorneys general of three of the relevant states—that a "'charge' that is 'imposed'" does not include "a gratuity that is requested," Dkt. No. 35-11 at 11—have "no bearing on the plausibility of the Bureau's asserted claims," but the meaning of these statutes is an issue of law, not fact.

Here, too, the Bureau resorts to an anti-evasion theory, arguing that SoLo "concocted a lending platform that evades usury limits by mischaracterizing the costs of loans as 'tips' and 'donations.'" Opp. 17-18. As explained above, however, the Bureau's attempt to dictate this fundamental issue of state policy has no basis in the CFPA and would trample states' prerogatives. In any event, only one of the nine states has anti-evasion language in its usury statute. AC ¶100 (South Dakota).

<u>The Bureau Makes No Attempt to Salvage its Unfairness Claim (Mot. 18-19)</u>: Although the Bureau's "unfairness" claim requires plausible allegations of each element of a CFPA claim, at a minimum the Bureau has failed to allege either substantial consumer injury or that any substantial injury was not outweighed by

8

countervailing benefits.  As to consumer injury, the Bureau's sole response is that it "plausibly alleges [] substantial harm to consumers."  Opp. 18.  As SoLo has shown, however, the Complaint does not raise a plausible inference that a consumer who repays a small-dollar loan obtained days earlier, along with an average tip of $10.40 and donation of $6.20 (typical of a $100 loan) – all on their own terms – has been substantially injured.  Well-pled facts are needed, but the Bureau alleges none.

As to countervailing benefits, SoLo's argument does not "go[] to the merits" (Opp. 18), as it is not asking the Court to "quantify" or "weigh" injuries and benefits. Rather, it is the Bureau's burden at this stage to allege facts making it plausible that any asserted injuries are not outweighed by countervailing benefits, and it has wholly failed to do so.  The Bureau asserts that there is "no benefit to consumers" (Opp. 18), but that is neither supported by alleged facts, nor is it plausible given the hundreds of thousands of consumers served by the marketplace and the option it provides for consumers – including those without a credit score or with impaired credit – to meet their emergency credit needs.  That the Bureau may disagree does not excuse its burden to allege facts which, if proven, would establish that the marketplace presents no substantial benefits.

## V.      THE COMPLAINT FAILS TO ALLEGE A FCRA CLAIM (COUNTS VIII-IX).

SoLo Score was not Provided in Exchange for "Fees" (Mot. 20):  The Bureau argues it is "reasonable" to "infer[]" that SoLo receives donations for providing the SoLo Score because donations are "the only method by which SoLo is paid for facilitating or brokering the loans."  Opp. 21.  But this argument is belied by the alleged facts, including that SoLo provided the Score to lenders before they even decided whether to fund a loan and regardless of whether a donation had been offered by the borrower – and for hundreds of thousands of loans no donation was offered. In any event, that a source of revenue allegedly funds assembly or evaluation of consumer information, or vice-versa, does not mean that assembly or evaluation was performed "*for* monetary fees."  *Cf. Sandofsky v. Google LLC*, 2021 WL 2941128,

9

at *4 (D. Mass. July 13, 2021) (citation omitted), *aff'd*, 2023 WL 9785578 (1st Cir. Sept. 6, 2023).  Nor is it relevant that one by-product of providing the SoLo Score was facilitating future revenue.  *See Tierney v. Advoc. Health & Hosps. Corp.*, 797 F.3d 449, 452 (7th Cir. 2015) (although company provided consumer information "in order to get paid," assembling and providing consumer information "is not its business," so FCRA did not apply).

Similarly, the Bureau argues that donations need only be provided "in part" for SoLo's provision of the SoLo Score, relying on the statute's use of the phrase "in whole or in part."  15 U.S.C. § 1681a(f).  But the Bureau misreads the statute:  that language modifies the definition's requirement that an entity "assembl[e] or evaluat[e] consumer credit information," not the separate requirement that the evaluation and assembly be "for monetary fees."  *Id*.  The Bureau's proposed reading is incompatible with the clear statutory text.[4]

<u>SoLo Score was not Provided on a Cooperative Nonprofit Basis (Mot. 20-21)</u>: The Bureau does not dispute that it is required to plausibly plead the *mutual exchange* of information.  The Bureau does not attempt to explain its conclusory assertion, first made after SoLo filed its original motion to dismiss, that there is a "mutual exchange of loan repayment and other consumer information."  AC ¶20.  Nor does the Bureau identify a single well-pled fact that would render this conclusion plausible, as it does not explain *what* specific information is shared, *when* it is shared, or *how* it is shared.  Indeed, the Complaint renders the Bureau's assertion implausible, as it alleges that SoLo was the loan servicer, which would mean that it already possessed this information.  *See* AC ¶19.

## CONCLUSION

The Court should dismiss this case with prejudice.

---

[4] The "totality of the circumstances" analysis referenced in *Abdallah v. LexisNexis Risk Solutions FL Inc.*, 2021 WL 1209419, at *6 (E.D.N.Y. Mar. 30, 2021), does not apply to whether information is being shared for a "fee," as *Abdallah* does not address that requirement.  Even were it otherwise, the totality of the circumstances demonstrates that the SoLo Score is not provided in exchange "for monetary fees."

10

Respectfully submitted,

Dated: September 23, 2024         By:   */s/ Laura A. Stoll*
                                        THOMAS M. HEFFERON (admitted *pro hac vice*)
                                        *THefferon@goodwinlaw.com*
                                        LAURA A. STOLL (SBN 255023)
                                        *LStoll@goodwinlaw.com*
                                        LEVI W. SWANK (admitted *pro hac vice*)
                                        *LSwank@goodwinlaw.com*
                                        **GOODWIN PROCTER LLP**

                                        Attorneys for Defendant
                                        SOLO FUNDS, INC.

DEFENDANT'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES     No. 2:24-cv-04108-RGK-AJR

## **LOCAL RULE 11-6.1 CERTIFICATION**

The undersigned counsel of record for Defendant SOLO FUNDS, INC. certifies that this memorandum of points and authorities is no more than 10 pages in length, which complies with the page limit for reply memorandum of points and authorities set forth in the Court's Standing Order Regarding Newly Assigned Cases.

Dated:  September 23, 2024

*/s/ Laura A. Stoll*
LAURA A. STOLL

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Central District of California by using the CM/ECF system on **September 23, 2024**.  I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I certify under penalty of perjury that the foregoing is true and correct. Executed on **September 23, 2024**.

Dated:   September 23, 2024                                    _/s/ Laura A. Stoll_
                                                                                          LAURA A. STOLL

DEFENDANT'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES No. 2:24-cv-04108-RGK-AJR